[Civ. No. 3889. Third Appellate District.—September 24, 1930.]

HERBERT H. SAWYER et al., Appellants, v. THE BOARD OF SUPERVISORS OF NAPA COUNTY et al., Respondents; UTILITY AND SERVICE, INC., Intervener and Respondent.

Clarence N. Riggins for Appellants.

Wallace Rutherford, District Attorney, for Respondents.

Nathan F. Coombs for Intervener and Respondent.

MR. JUSTICE PLUMMER Delivered the Opinion of the Court.—By this action the petitioners sought a writ of mandate to compel the Board of Supervisors of Napa County either to adopt a certain proposed ordinance, or to submit

the same to an election. The trial court denied the appellants' petition, and the cause is now before us upon appeal from such order.

It is conceded that the initiative petition proposing the ordinance is in proper form and contains a sufficient number of signers. The proposed ordinance has for its purpose a limit of the size of storage dams on Napa River, and is, so far as necessary to be considered herein, as follows:

"Ordinance No. ——.

"An Ordinance to Protect Life and Property in Napa Valley.

"The People of the County of Napa do ordain as follows:

"Section 1. No storage dam or reservoir or combination of storage dams or reservoirs shall ever be built on Napa River or its tributaries at any point or points thereon above the city of Napa, that will either single, or collectively impound or store more than ten thousand acre feet of water; nor shall more than ten thousand acre feet of water ever be impounded or stored behind any storage dam or in any reservoir or combination of storage dams or reservoirs, that may be constructed either before or after the passage and going into effect of this ordinance, at any point or points on said Napa River or its tributaries above the city of Napa.

"Section 2. The term 'acre feet of water' as used in this ordinance means a quantity of water sufficient to cover one acre of land a foot in depth. The term 'combination of storage dams or reservoirs' as used in this ordinance means a series of storage dams or reservoirs built one above the other upon the same stream in such a manner that if an upper one should break, the water contained therein would come down to a lower dam or reservoir in said series, provided that nothing herein contained shall apply to any storage dam or reservoir that is only capable of impounding less than one thousand acre feet of water.

"Section 3. The construction of any storage dam or reservoir or combination of storage dams or reservoirs on Napa River or its tributaries at any point or points thereon above the city of Napa, that will either singly or collectively impound or store more than ten thousand acre feet of water, and/or the impounding or storing of more than ten thousand acre feet of water behind any storage dam or in any reservoir or combination of storage dams or reservoirs that may be constructed either before or after the passage and

going into effect of this ordinance, at any point or points on said Napa River or its tributaries above the city of Napa, is hereby declared to be a public nuisance.''

The remainder of the ordinance has to do with enforcement provisions and not with substantive matter.

To the appellants' petition the respondents interposed a demurrer containing nineteen specifications, the principal ones only of which need be mentioned, to wit: That the Board of Supervisors does not possess the authority to pass the proposed ordinance; that the ordinance is in conflict with the general laws of the state of California; that the ordinance is unreasonable; that the ordinance is an unreasonable application of the police power of the state; that the ordinance is special and local in its nature, and not one in which the entire body of citizens of the county of Napa are interested, and is therefore not subject to the initiative.

The demurrer referred to was sustained without leave to amend.

The record shows that Napa 'River, including its tributaries, above the city of Napa, lies wholly within the county of Napa. The city of Napa is situated on both sides of the Napa River. The Napa Valley is rather narrow, and the grade thereof is considerable. The city of Napa contains a population of some 7,000 people and is surrounded by a farming country, rather densely populated. It is set forth in the briefs that an acre-foot of water contains 321,000 gallons, and that 10,000 acre-feet would contain sufficient water to cover 1,000 acres of land ten feet in depth. The petition further sets forth that were a dam of any greater size than the limitations contained in the proposed ordinance, to be built on the Napa River, that in the event of a breakage thereof, the volume of water discharged under such conditions would be sufficient to practically wipe out the city of Napa.

Basing their contention upon the facts which we have recited, appellants contend that section 11 of article XI of the Constitution empowers the Board of Supervisors to enact the proposed ordinance. That section reads: ''Any county, city, town or township may make and enforce, within its limits, all such local, police, sanitary and other regulations as are not in conflict with general laws.'' Only a limited number of authorities need be cited in support of

the police power in relation to the erection of dams and the maintenance of reservoirs containing large quantities of water above populous districts.

In 12 C. J., page 916, the police power applicable to situations as here presented is thus stated: "It is a well recognized function of the police power to promote the public safety by regulating dangerous occupations, restraining dangerous practices, and prohibiting dangerous structures." In a rather extended note to the case of *Gas Products Co.* v. *Rankin*, reported in 24 A. L. R., beginning on page 307, we find the following relative to police powers: "The weight of authority, numerically at least, is to the effect that not only adjoining land-owners, but the public at large, have an interest in the preservation of natural resources of land such as gas, oil, timber, subterranean waters, etc., sufficient to justify appropriate legislation to prevent exploitation of waste thereof," etc. To the same effect are the authorities quoted in a note in 51 A. L. R., page 279.

In the case of *Bent Bros.* v. *Campbell*, 101 Cal. App. 456 [281 Pac. 771], this court considered somewhat at length the police powers of the state relative to the construction of dams for the impounding of waters of different streams, and cited a number of authorities showing that the police power may properly be applied to the regulation and construction and maintenance of dams and reservoirs. This court there said: "That the police power of the state to supervise and regulate the construction and, maintenance of dams impounding large bodies of water remained exercised until the disastrous consequences following the break of the St. Francis dam, in the southern part of the state, is no argument against its existence, but the experiences attending the breaking of that dam emphasizes the necessity for and the constitutionality of the police powers being extended to and including such structures, in order that the safety of persons and property may be conserved." ■ We may further add that under the conditions existing in this state, and in the development and conservation of water resources of the state, and the development of great power plants, the holding that the police power to regulate the construction and maintenance of such structures is necessarily inherent, in order that the lives and property rights of the people who

live below such structures, and in the course which the impounded waters would take in the event of the giving way of any such structure, may be protected, makes the whole subject one of public interest as distinct from mere private rights, and, therefore, a subject clearly within the police powers of the state.

Section 4058 of the Political Code, governing the procedure relative to initiative ordinances, provides for the presentation to a board of supervisors of the petition and proposed ordinance requesting the passage of the ordinance, and in the event of the failure of the board so to do, that the ordinance be submitted to the electorate of the county for their approval or rejection. This section of the code was enacted in pursuance of the amendment to section 1 of article VI of the Constitution, adopted October 10, 1911.

■ In the passage and adoption, or ratification by the electorate, of initiative ordinances, the power so to be exercised cannot extend beyond the power possessed by the Board of Supervisors. That is to say, if the Board of Supervisors to which the petition and ordinance is presented possesses no authority to enact the proposed ordinance, then and in that event the initiative power so to do does not exist. (See *Galvin* v. *Board of Supervisors,* 195 Cal. 686 [235 Pac. 450].) ■ Again, if the ordinance is void for any reason, the petition for a writ of mandate should be denied. That the ordinance is special, and applies only to the Napa River, is distinctly made to appear; likewise, the futility of the ordinance is shown by a consideration of the first section. It proposes to prohibit simply the building of a dam, or series of dams, that will collectively impound or store more than 10,000 acre-feet of water. That a structure erected, complying strictly with the provisions of section 1 of the proposed ordinance, would not in anywise reasonably apply the police powers of the county, cannot be gainsaid. The material of which a dam of the proposed size is to be constructed is not mentioned. The plans and specifications, therefore, are not to be determined by anyone enforcing the police powers of the county. A structure complying strictly with the different sections of the ordinance might present to the residents of the city of Napa an impending danger at all times. There is nothing in the ordinance from which any security might be obtained by the

people of Napa Valley living below the dam. All there is in the ordinance, giving it its widest scope, is simply an assurance that the flood of waters that might be discharged by the giving way of such a structure shall not exceed a certain volume, either in size or in intensity. There is nothing in the ordinance looking to the safety of such a structure, other than as to mere size. We call attention to these matters to emphasize what is hereinafter stated relative to the act of the legislature approved June 10, 1929, adding certain duties to the department of public works relative to the erection and maintenance of dams and storage reservoirs, as containing all there is and covering all there is of the police powers sought to be enforced by the proposed ordinance. ■ The policy of the state to conserve the waters thereof, and to put the same to the highest possible use, is distinctly set forth, as appears by the Statutes of 1921, page 1685. We there find the following: "It is hereby declared that the People of the State of California have a paramount interest in the use of all the waters of the State, and that the State of California shall determine what waters of the State, surface and underground, can be converted to public use or controlled for public protection." To what extent this may be done is shown by the case of *Bray* v. *Superior Court of Siskiyou County,* 92 Cal. App. 428 [268 Pac. 374, 1081], in which the constitutionality of the Water Commission Act, approved June 16, 1913, was upheld by this court and hearing denied by the Supreme Court. A large number of cases might be cited illustrating the holding of the court as to the public use of waters and public character of dams and reservoirs, as distinct from mere local or private interests or undertakings. The statements which we have made, relative to the public character of such works, have become mere truisms, and do not appear to us to call for citation of authorities. Even in the case of *Herminghaus* v. *Southern California Edison Co.,* 200 Cal. 81 [252 Pac. 607], where a conflict only of private interests was shown, we find the following language: "If the State were here assaying to uphold an effort on its part to work out impartially, unselfishly and in the interests of the whole people some general plan or system for the equitable adjustment of rights and uses in its flowing streams with a view to the conservation, development, and

distribution of the dynamic forces and generative and fertilizing fructibilities of their waters, it might well be argued that public policy, public interest, and a most liberal interpretation of the police powers of the State might rightfully be invoked in support of such an effort.''

In view of our construction of what is popularly known as the ''Dam Act of 1929'' (Stats. 1929, p. 1505), we do not think it necessary to give any attention to the question of riparian rights argued in the briefs, or to the possible construction that might be given to the various provisions of the proposed ordinance.

Section 3 of the act of the legislature, approved June 10, 1929, reads in part as follows: ''The department is hereby invested with authority under the police power of the state and directed to supervise the construction, enlargement, alteration, repair, maintenance, operation, and removal of dams for the protection of life and property as hereinafter provided. All dams in the State of California whether heretofore or hereafter built or now under construction shall be under the jurisdiction of the department and it shall be unlawful to construct, enlarge, repair, alter, remove, maintain or operate any dam except upon approval of the department as hereinafter provided. No city, county, or city and county shall have authority by ordinance enacted by the legislative body thereof or adopted by the people under the initiative power or otherwise, to regulate or supervise, or to provide for the regulation or supervision of any dams or reservoirs in this state, or the construction, maintenance or operation thereof, nor to limit the size of any dam or reservoir or the amount of water which may be stored therein, it being the intent of the legislature by this act to provide for the regulation and supervision of dams and reservoirs exclusively by the State.''

By the very terms of section 21 of article XI of the Constitution, investing counties with police powers, the power thus granted is so limited as not to conflict with general laws. In arriving at the intent of the legislature in adopting the section referred to, we are aided by the language of the act itself. It is there declared that the legislature intends to provide for the exclusive regulation and supervision of dams and reservoirs. It is conceded, of course, that the prohibition contained in the section pur-

porting to limit the powers of cities and counties, is ineffective unless the field has been occupied by legislative enactments. The language of the section relative to the field occupied by the state is: "To supervise the construction, enlargement, alteration, repair, maintenance, operation and removal of dams," etc. The whole act must be considered, also, in determining the extent of the field covered by the general law. Section 4 of the act provides for the removal of dams already completed. Section 5 is extensive in its terms; provides for the approval of new dams; calls for accurate knowledge as to the area of the drainage basin, rainfall and stream flow, records of floods, etc. Data must be furnished concerning subsoil and foundation, sites required to be drilled or otherwise prospected. Applications must set forth the purpose of impounding waters. Section 6 relates to the approval of repairs, alteration or removal of dams. By section 7, terms and conditions of approval are intended to be such as to safeguard life and property. Section 8 requires inspection of dams during construction, and permits the engineer to make further recommendations. Section 11 specifies that the findings and orders of the department shall be final and conclusive and binding upon all state agencies, regulatory or otherwise, as to the safety, design, construction, maintenance and operation of any dam. Section 12 provides for supervision over the maintenance and operation of dams, so far as may be necessary to safeguard life and property, etc. Provisions for enforcing the powers and duties which we have mentioned are further set forth in the act, but are not material here.

In the case of *Bent Bros.* v. *Campbell, supra,* this court held that the act in question gives the state engineer power to enforce his recommendations and suggestions by enabling him to begin actions to enjoin and restrain the construction or maintenance of any dam not constructed or repaired according to approved plans and specifications, and through the medium of the court, affect the safety of persons and property living below the property or place of the construction of the dam, and the creating of a reservoir which might become a menace to the property and lives of persons in the course which the impounded waters would take in the event the proposed structure proved inadequate to withstand the

pressure of the impounded waters. And, further, that ''Section 18 of the act authorizing the state engineer to institute actions by way of *mandamus* or injunction puts teeth enough therein to make all the reasonable mandates of the state engineer effective''.

█ In view of the authorities which we have cited, we think it is clear that the act of the legislature, approved June 10, 1929, relative to the construction of dams and reservoirs for the impounding of waters, is a constitutional exercise of the police powers of the state, and that the analysis of the act set forth leaves nothing for county or municipal regulation. That such structures must be erected according to plans and specifications approved, as provided for by the state and the basis for the adoption of such plans, including data as to run-off of the streams, the area of the watershed, the extent of precipitation, necessarily includes the height of the structure as well as the foundation, the kind of material to be used, and practically every engineering element entering into the erection and maintenance of such structures, is apparent. Much has been said as to the extent to which such structures would interfere with the underground flow or subsoil irrigation from the streams upon which dams are built, and, also, argument has been presented to the effect that preventing flood waters flowing over adjacent lands interferes with the forcing of additional waters into the soil, thus giving it additional fertility. These questions, as well as the riparian rights involved, are matters for determination by the courts, and not mere police regulations. Other questions dealt with in the briefs are not set forth for the reason that what we have said seems to us determinative on this appeal.

The order of the trial court is affirmed.

A petition for a rehearing of this cause was denied by the District Court of Appeal on October 24, 1930, and a petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on November 20, 1930.