[Civ. No. 778. Fourth Appellate District.—March 25, 1932.]

THE DEPARTMENT OF PUBLIC WORKS OF THE STATE OF CALIFORNIA et al., Petitioners, v. THE CITY OF SAN DIEGO (a Municipal Corporation) et al., Respondents.

U. S. Webb, Attorney-General, C. C. Carleton, Spencer Burroughs and Henry Holsinger for Petitioners.

C. L. Byers, City Attorney, H. B. Daniel, Assistant City Attorney, Hunsaker & Cosgrove, Wright & McKee, O'Melveny, Tuller & Myers and Louis W. Myers for Respondents.

BARNARD, P. J.—This is an original proceeding seeking a writ of mandate to compel the owner and the lessee of a certain dam to do certain work thereon. The action is brought by the Department of Public Works of the State of California and the state engineer, under a claim of authority vested in them by what is popularly known as the "Dam Act of 1929" (Stats. 1929, p. 1505).

The petition alleges that the respondent company is the owner and the respondent city is the lessee of what is known as the "Lake Hodges Dam", situated about twenty-five miles northerly from San Diego; that this dam is a concrete multiple arch dam of the Eastwood type, having a height of 115 feet and a storage capacity of 37,500 acre-feet of water; that when completed in 1918 the dam was approved by the then state engineer, but that since that time the science of designing and constructing dams of this type has made a very rapid and extensive advancement, in the light of which increased knowledge a lack in the design and construction of the buttresses of this dam is now apparent; that on October 1, 1925, the respondent company leased the dam to the respondent city with an option to purchase the same; that during 1928 and 1929 a number

of investigations were made by agents of the state engineer and others as to the condition of this dam, resulting in reports to the effect that the design and construction of the dam, and particularly of the buttresses, are not in accord with established engineering principles; that various cracks exist which are gradually increasing in width and that the dam is located in a region where earthquake shocks are reasonably to be anticipated; that on November 16, 1929, the respondent city, pursuant to the provisions of the Dam Act, filed an application for permission to enlarge the spillway of said dam, which application was approved and that work completed in 1930; that on January 24, 1930, pursuant to the provisions of the Dam Act, the respondent city filed its application for the approval of this dam; that an inspection of the dam was made in June, 1931, by engineers and geologists representing the state engineer, and based upon their findings and reports and other previous reports and inspections, the state engineer found that the dam was unsafe; that on September 10, 1930, the respondent city was notified in writing that the dam would not be approved until the buttresses were strengthened, and the filing of plans and specifications for the strengthening of said buttresses was requested; that the respondent city having failed and omitted to file such plans and specifications on August 15, 1931, the said engineer issued an order directing said city to strengthen the buttresses of said dam and to commence the work on or before October 15, 1931, and to complete the same on or before December 31, 1931, and that a similar order was served upon the respondent company; that both respondents have failed, neglected and refused to comply with said orders; that between May, 1931, and January 8, 1932, a number of other investigations of said dam were made by various engineers and geologists representing the state engineer; that these various investigators reported to the effect that the buttresses of this dam are improperly designed and constructed and that there has been an annual variation in width and also an accumulative width of cracks in said dam; and that earthquake shocks which might be expected in that region might cause some of the buttresses to collapse and the structure to fall. It is then alleged that said Lake Hodges dam was on August 15, 1931, and at all

times since has been and now is unsafe and a menace to life and property; that there is now impounded behind said dam about 22,000 acre-feet of water; that said dam might suddenly collapse and release a flood of water which would endanger the lives of many people living in and passing through the area below it; that in the past there have been ten earthquakes in that region of sufficient intensity to injure this dam, although none of these has occurred since the dam was constructed; that the present season is one of very heavy precipitation and run-off, that the time of the heaviest run-off in this shed is in the months of January and February, and it is anticipated that said reservoir will then be filled to capacity; that although the spillways of said dam are adequate to accommodate large floods, a flood may reasonably be expected in such a season as this, of such proportions as to cause an overtopping of the entire dam, setting up severe vibrations in the buttresses and threatening the entire structure; that its defects in design and construction render this dam of doubtful construction and safety under usual and ordinary conditions, and that such safety would become more doubtful in times of flood; and that it would take eighteen days to drain the reservoir at its present level and with the outlets now provided, and twenty-six days to drain it if the reservoir was full. It is then alleged that it would be a hazardous undertaking to breach this dam during the present season of precipitation and that it would be impractical and an economic waste to enlarge the outlets sufficiently to prevent the accumulation of water in the reservoir and that "the only economic and practical means of speedily obtaining protection to life and property and which will render said dam safe with the least possible delay and preserve its usefulness is the immediate commencement and energetic prosecution of the work necessary to thoroughly strengthen the buttresses by bracing and inter-bracing". The prayer is that a writ issue directing each of the respondents to "forthwith strengthen the buttresses of said Lake Hodges dam and to do so pursuant to the authority by law vested in the petitioners and to do all things necessary or incidental to the doing of said work".

Pursuant to the above petition, an alternative writ of mandate was issued by the Supreme Court and made re-

turnable before this court, commanding the respondents to strengthen the buttresses of said dam or to show cause why they should not be required so to do. Demurrers and answers were filed by the respondents, the demurrers being first argued, and the case is now before us upon the points raised by these demurrers.

The act here under consideration has been held to be a proper exercise of the police power of the state. (*Bent Bros., Inc.*, v. *Campbell*, 101 Cal. App. 456 [281 Pac. 717, 719]; *Sawyer* v. *Board of Supervisors*, 108 Cal. App. 446 [291 Pac. 892]; *Los Angeles County Flood Control Dist.* v. *Wright*, 213 Cal. 335 [2 Pac. (2d) 168].) While the general validity of this act and the right of these agencies of the state to enforce reasonable regulations in the manner provided may be considered as established, we are here called upon to consider the right of the department to affirmatively compel the repairing or rebuilding of a dam. Any order we could make is of course limited by the terms of the alternative writ which was issued. (*Gay* v. *Torrance*, 145 Cal. 144 [78 Pac. 540].)

The first question presented is whether this act authorizes the petitioners to compel the doing of certain work upon this dam, not indirectly by withholding their approval or their permission for its further use, and not with the alternative of refraining from maintaining and using a dam which may be in an unsafe condition, but affirmatively and in any event. In effect, the case before us goes to the extent of presenting the question of whether the owner of a dam may be compelled to rebuild the same, since the petition clearly shows that the work sought to be compelled to be done is deemed necessary fully as much because of defects in the original design and construction of the dam, due to the lesser amount of knowledge prevailing at that time, as by reason of any subsequent deterioration in the structure. The first question then is whether the terms of this act are to be so interpreted as to give to the petitioners the right to directly compel the doing of particular work, or as merely to give them the power to prevent either the construction or the maintenance of an inadequate or unsafe dam, through the methods provided in the act. In *Bent Bros., Inc.*, v. *Campbell, supra*, the court said:

"As we read the act there is nothing which authorizes the state engineer to directly require the construction of a dam according to any particular plans or specifications, nor does the act authorize the state engineer to make any material alterations in any contract which has been entered into between an owner and contractor for the construction of a dam. But while the act does not, in terms, directly authorize the state engineer to do what we have mentioned, it does indirectly give him power to enforce his recommendations and suggestions by enabling him to begin actions to enjoin and restrain the construction or maintenance of any dam not constructed or repaired according to approved plans and specifications, and through the medium of the court affect the safety of persons and property living below the point or place of the construction of the dam, and the creating of a reservoir which might become a menace to the property and lives of persons in the course which the impounded waters would take in the event the proposed structure proved inadequate to withstand the pressure of the impounded waters."

In *Sawyer* v. *Board of Supervisors,* 108 Cal. App. 446 [291 Pac. 892, 896], the court said: "In the case of *Bent Bros.* v. *Campbell, supra,* this court held that the act in question gives the state engineer power to enforce his recommendations and suggestions by enabling him to begin actions to enjoin and restrain the construction or maintenance of any dam not constructed or repaired according to approved plans and specifications, . . . "

The court thus points out that there is nothing in the act which authorizes the state engineer to directly require a particular kind of construction in the erection of a dam, although indirectly the same result may be accomplished. We think the same thing is true with respect to the maintenance of a dam already constructed. While the approval of the department is necessary for the continued operation and maintenance of an existing dam, and while a large control is thus possible in the indirect way of withholding such approval, with a penalty for otherwise continuing operation, and while the department is given power to enforce the provisions of the act through a court proceeding or even by summarily relieving the stress upon a dam to the extent of completely emptying it if necessary, on the other

hand, we see nothing in the act purporting to authorize the department to compel the owner of a dam to maintain the same, or to compel that certain work be done with that end in view, without regard to whether or not the owner of such a dam desires to continue to maintain and to operate the same.

Section 4 of the act requires the owner of an existing dam to apply for a certificate of approval, which was done in this case. It also requires the department to examine the dam within three years, which was here done, and provides that the department shall either issue a certificate of approval or an order directing the work necessary to be done and fixing a time therefor, the latter of which was done in this case. While the section thus provides for the issuance of a certificate of approval if the work is done to the satisfaction of the engineer, this particular section of the act does not provide what shall be the effect of the failure to do the work ordered. Section 12 of the act authorizes the state engineer, in an emergency, to take any remedial action that is necessary to protect lives and property, even to the extent of partially or entirely emptying the dam. Section 17 makes a failure to comply with the provisions of the act a misdemeanor and provides a penalty therefor. Section 18 provides that in case of a violation of the act, the department may commence an action or proceeding in the superior court "for the purpose of having such violations or threatened violations stopped and prevented". In our opinion, the purpose and effect of this act is to confer upon the department the right to prevent the continued maintenance and operation of a dam in an unsafe condition but not to authorize the department to compel either the rebuilding or the continued operation of such a dam. Nowhere in the act is there any provision that the owner of a dam may be compelled to do a specific thing or to do any work in a particular way, except as a condition for obtaining the approval of the department in the event it is desired to continue to operate the dam. As we read the statute, the owner of such a dam may be restrained from maintaining it in such a condition that it may be dangerous, he may be punished for violating the terms of the act, and he may be subject to having his reservoir summarily emptied to a sufficient extent to make it safe, in case of an emergency,

or in other words, he may be prevented from operating and maintaining a dam in an unsafe condition. But on the other hand, he may neither be directly compelled to remodel, repair or rebuild the dam, nor may he be compelled to continue to maintain or operate the same nor directly compelled to put it into a condition where it could safely be continued in operation. We think the act is preventive rather than compulsory in nature. Without doubt, so far as this act is concerned, the respondents would have the right to cease to use and maintain this dam. Possibly they might then be compelled by mandate to remove the dam, at least sufficiently to prevent its becoming a menace to the public. But a very different sort of order is here asked for.

It would appear that any such interpretation of the act here involved as would permit the department to affirmatively compel the doing of particular work regardless of whether or not the owner of a dam desired to continue to operate and maintain the same would, at least so far as the respondent company is concerned, be in violation of article I, section 14, of the Constitution of California and of the fourteenth amendment to the Constitution of the United States, as taking private property for public uses without compensation. (*Pacific Tel. & Tel. Co.* v. *Eshleman,* 166 Cal. 640 [Ann. Cas. 1915C, 822, 50 L. R. A. (N. S.) 652, 137 Pac. 1119]; *Chicago, B. & Q. Ry. Co.* v. *People of State of Illinois,* 200 U. S. 561 [4 Ann. Cas. 1175, 50 L. Ed. 596, 26 Sup. Ct. Rep. 341]; *West Chicago R. R.* v. *Illinois ex rel. Chicago,* 201 U. S. 506 [50 L. Ed. 845, 26 Sup. Ct. Rep. 518]; *City of Philadelphia* v. *Provident Life & Trust Co.,* 132 Pa. 224 [18 Atl. 1114].) In these and many other cases, while the right of the state in the exercise of its police power to compel the doing of certain things as a condition to the continued use of property for specific purposes has been upheld, we know of no case where the owner of property has been deprived of a choice between complying with the requirements made and ceasing to so use his property. In *Bent Bros., Inc.,* v. *Campbell, supra,* the court said: "While not so denominated, the act is purely a police regulation and must stand or fall as so considered." While the police power may limit and restrict the uses to which an owner may put his property, it may

not compel him to use such property for a particular purpose if he prefers to abandon such a use thereof. Counsel for the respondent company furnish the apt illustration that a farmer with a dam costing $10,000 and only valuable to him to that extent, could not, although such a dam be unsafe and dangerous to the lives of others, be compelled to rebuild or repair the dam in such a manner as to cost $50,000, an amount far in excess of its value to him, even though that amount might be required to make the dam safe, although he might well be compelled, as an alternative proposition, to forego the use of the dam.

We think the particular writ of mandate here sought is not available to the petitioners for the further reason that the dam act itself provides an adequate statutory remedy and, as has been pointed out, this act is purely a police regulation and its only purpose is to prevent the maintaining of dams in such an unsafe condition as will endanger the lives and property of the public. In case of a violation of its provisions, two remedies are provided in the statute. Section 18 of the act provides for an action in court, a portion thereof reading as follows: ''The department shall bring such action or proceeding by petition in such superior court, alleging the violation or threatened violation complained of, and praying for appropriate relief by way of *mandamus* or injunction. It shall then be the duty of such court to specify a time, not exceeding twenty days after the service of the copy of the petition within which the owner or person complained of must answer the petition, and in the meantime said owner or person may be restrained. In case of default in answer or after answer the court shall immediately inquire into the facts and circumstances of the case. Such parties shall be joined as the court may deem necessary or proper in order to make its judgment, order or writ effective. The final judgment in such action or proceeding shall either dismiss the action or proceeding or direct that the writ of *mandamus* or injunction issue or be made permanent as prayed for in the petition, or in such modified or other form as will afford appropriate relief.''

In *Bent Bros., Inc.*, v. *Campbell, supra*, the court said: ''Section 18 of the act authorizing the state engineer to institute actions by way of *mandamus* or injunction puts

teeth enough therein to make all the reasonable mandates of the state engineer effective.''

Although this section provides also for a writ of *mandamus*, it must follow that this would apply only under certain circumstances and for a proper purpose. It might apply, for instance, where it was impossible to prevent a continuance of the danger except by compelling the removal of the dam. But, so far as here appears, these petitioners not only have an adequate remedy through an injunction but a much more speedy and convenient one, since an injunction could be secured on the very day an action was filed, upon a proper showing of facts. A second remedy given by the statute, in section 12 thereof, is the right, in case the condition of the dam is so dangerous as not to permit of time for the issuance and enforcement of an appropriate order, to take any remedial means necessary to protect life and property, even to the extent of lowering the water in the reservoir or of completely emptying the same. The petition herein alleges that these remedies are inadequate for the reason that, with the present outlet facilities of this dam, it would take eighteen days to drain the reservoir at its present level and that during the years 1916 and 1927 floods occurred which caused an inflow into the reservoir greater than the capacity of the outlets. It neither appears that it would be necessary to completely drain the reservoir to make this dam safe, nor how much lowering of the water would be required to make it safe, nor how long this would take, nor how long it would take to do the work, the doing of which is here sought to be compelled. So far as appears, the strengthening sought to be compelled in this proceeding may take longer than the other remedies which are open to petitioners, and as much danger of a flood creating an emergency may exist in the one case as in the other. Already this proceeding has taken sixty days and may consume much more time. Under ordinary conditions, the statutory remedies given the petitioner are entirely sufficient and in case of a sudden emergency, such as it is alleged occurred in 1916 and 1927, it is difficult to see why the very summary powers given to the department in such an emergency would not be more speedy and more effective, in so far as preventing loss of life and prop-

erty through any weakness in this dam, than any writ that could be issued in such a proceeding as this. It seems apparent that this writ is sought not as a means of meeting an emergency or as the only means of preventing the operation of a dam in an unsafe condition, but for the general purpose of compelling specific work to be done, with an eye to continuing the economic value of the dam. While this latter object is a commendable one, we think it comes neither within the police power of the state nor the terms of this act.

A number of other questions are raised, including one as to the jurisdiction of this court, in view of the fact that the act provides that a proceeding shall be brought in the superior court; whether the granting of this writ as against the respondent company would impair the obligation of a contract, since the lease referred to provides that the respondent city shall pay for any repairs or alterations to the dam; and whether such an order could be enforced against the respondent city since the petition does not allege that the city has funds available which could be lawfully appropriated to this purpose. It is unnecessary to discuss these questions in view of our conclusion that the petitioners are not entitled to the writ prayed for, under the provisions of the act itself.

The ends sought to be attained by the provisions of this act are both necessary, under well-known conditions, and legal, as an exercise of the police powers of the state. Broad powers are given to the department, and rightly so, to prevent the operation and maintenance of dams in such a condition as will endanger the lives and property of the public. We think these powers are limited by the plain provisions of the act to the prevention of the construction and operation of unsafe dams, and that they do not extend to the point where the owner of a dam may be compelled to continue its operation or directly compelled to perform specific work which might be necessary to any such continuance.

The demurrers are sustained and the peremptory writ is denied, without prejudice to any other proper proceeding.

Marks, J., and Lambert, J., *pro tem.*, concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on April 21, 1932, and an application by petitioners to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on May 23, 1932.