SINALOA LAKE OWNERS ASSOCIATION, INCORPORATED, a California corporation; Robert A. Ain; Diantha Ain; Leonard Bellenson; Ann Bellenson; Alvin Bennett; Edward T. Bergin; Edward T. Bergin as Executor for the Estate of Ruth Bergin; Edward D. Bigenho; Caryl Bigenho; Junious W. Burrage, Pearl Burrage; Alan T. Canfield; Irene R. Canfield; Robert A. Goosen, Judith A. Goosen; Malcolm R. Harding; Patricia I. Harding; John B. Hayes; Janet H. Hayes; William Hill; W.L. Hodson; Dorothy J. Hodson; William J. Hull, Jr.; Donna R. Hull; C.R. Joshi; Rekha C. Joshi; Karl Kernberger as Executor for the Estates of Mo-

nica Kernberger and H.R. Kernberger; Richard D. Price; Elaine D. Price; Peter J. Schnetzler; Jannice M. Schnetzler; Fred N. Schultz; Diane Schultz; William A. Seaman; Jane M. Seaman; E. Dean Seymour; Josephine Seymour; Grace Sorrels; Ronald J. Sparks; Mary Lou Sparks; David L. Strathearn; Sandra Stutzman; James Stutzman; and Shirley E. Najemnik Turner, Plaintiffs,

v.

Roger STEPHENSON; James Doody; V.H. Persson; David Jacinto; James E. Ley; and Howard McEwen as Executor for the Estate of Sheldon Slack McEwen, Defendants.

No. CV 83–8220–ER.

United States District Court,
C.D. California.

Sept. 24, 1992.

Jerrold A. Fadem, Keith W. Douglas, Mark Schaeffer, Fadem & Douglas, Los Angeles, Cal., for plaintiffs, Sinaloa Lake Owners Ass'n & individual plaintiffs.

Gary A. Hamblet, Shari L. Rosenthal, Eugene Egan, Breidenbach, Swainston, Crispo & Way, Los Angeles, Cal., for defendant, James J. Doody.

Jeffrey S. Kravitz, Keith G. Wileman, Lord, Bissell & Brook, Los Angeles, Cal., for defendants, Roger Stephenson & James E. Ley.

Thomas A. Freiberg, Jr., David A. Buchen, Fulbright & Jaworski, Robert C. Ceccon, Saskia T. Asamura, Richards, Watson & Gershon, Los Angeles, Cal., for defen-

dants, David Jacinto, & Howard McEwen as Executor of the Estate of Sheldon McEwen.

Thomas J. Feeley, Jr., Jean M. Daly, Stone & Feeley, P.C., Los Angeles, Cal., for defendant, Vernon Persson.

## MEMORANDUM DECISION AND ORDER GRANTING JUDGMENT AS A MATTER OF LAW UNDER FEDERAL RULES OF CIVIL PROCEDURE 50(a)(1) AND 50(a)(2)

RAFEEDIE, District Judge.

This case came before the Court for a jury trial on August 18, 1992, the Honorable Edward Rafeedie, United States District Court Judge presiding. Jerrold A. Fadem, Mark Schaeffer, Fadem and Douglas, for plaintiffs, Sinaloa Lake Owners Association. Gary Hamblet, Shari Rosenthal, Breidenbach, Swainston, Crispo and Way, appearing for the defendant James Doody; Thomas J. Feeley, Jean M. Daly, Stone & Feeley, P.C., appearing for the defendant Vernon Persson; Jeffrey S. Kravitz, Keith Wileman, Lord, Bissell and Brook, appearing for defendants Roger Stephenson and James Ley; Thomas A. Freiberg, Jr., David A. Buchen, Fulbright & Jaworski, Saskia T. Asamura, Richards, Watson and Gershon, appearing for defendants David Jacinto and Howard McEwen, executor of the estate of Sheldon McEwen.

At the conclusion of plaintiffs' case, the Court granted Judgment as a Matter of Law under Federal Rule of Civil Procedure 50(a)(1)[1] as to all defendants, except defendant Doody. At the conclusion of the defendant's case the Court granted defendant Doody's Motion for Judgment as a Matter of Law under Federal Rule of Civil Procedure 50(a)(2)[2].

## INTRODUCTION

This was an action brought by the Sinaloa Lake Owners Association, under 42 U.S.C. § 1983, against the Chief of the California Division of Safety of Dams (hereinafter DSOD), Mr. James Doody, and his subordinate engineers who responded to and were active in dealing with an emergency dam failure during heavy rains in late February and early March of 1983. Plaintiffs alleged defendants intentionally deprived them of rights under the Fifth and Fourteenth Amendments to the United States Constitution by breaching their dam. Breaching a dam is the process of cutting a "V"-shaped notch in the dam to preclude the accumulation and storage of water behind the dam.

First, plaintiffs argue that defendants' decision to breach Sinaloa dam was made without good cause because there was never an emergency situation at the dam. The gravamen of plaintiffs' case is that the members of the California Division of Safety of Dams acted for an improper purpose by secretly forming the intent to breach the dam even though it was not required. Plaintiffs contend that this intent was concealed for the purpose of preventing plaintiffs from taking any legal actions to oppose the dam's breach. This claim, they allege, is supported by engineer Doody's act of directing contractors to breach the dam without immediately notifying the plaintiffs of this decision. Thus, plaintiffs argue that defendants specifically intended to deprive the plaintiffs of notice and an opportunity to be heard. This comprises plaintiff's procedural due process claims.

Plaintiff's substantive due process claim challenges the breaching of the dam as an arbitrary and capricious act. Plaintiffs argue that the breach was ordered by the

---

**1.** Federal Rule of Civil Procedure 50(a)(1) provides "[i]f during a trial by jury a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonably jury to have found for that party with respect to that issue, the court may grant a motion for judgment as a matter of law against that party on any claim ... that cannot under the controlling law be maintained without a favorable finding on that issue."

**2.** Federal Rule of Civil Procedure 50(a)(2) provides that "[m]otions for judgment as a matter of law may be made at any time before the submission of the case to the jury. Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment."

defendant despite defendant's knowledge that the dam was perfectly safe and did not pose a public safety hazard which would require a breach. Plaintiffs further allege, as a part of this claim, that the action was also taken vindictively, in retaliation against plaintiffs for not responding to safety demands made by the DSOD on prior occasions. Finally, plaintiffs contend that even had emergency conditions existed, defendants should have properly responded with less intrusive means than the breaching of their dam.

## FACTS

The plaintiffs own homes nearby Sinaloa lake. The Sinaloa Lake Owners Association (SLOA) owns the Sinaloa Dam (the Dam) and the land beneath the lake. The dam is an earthen structure, built in 1925 as a farming reservoir. How the dam was constructed and its exact composition at the base were unknown. Defendant James Doody was Division Chief of the DSOD at the time of the events precipitating this litigation. He is now retired. The DSOD was responsible for the supervision of dams and reservoirs within DSOD jurisdiction. The DSOD's functions are governed by Sections 6000 through 6501 of the California Water Code.

In late February and early March of 1983, there were heavy rains in the area of Sinaloa dam which caused the water level behind the dam to rise. These rains continued through March 3, 1983. On March 2, 1983, two large land slides occurred on the face of the dam. These slides were reported to officials of the City of Simi Valley and Ventura County. That same day, the Simi Valley Chief of Police ordered the evacuation of hundreds of downstream residents due to the potential danger presented by the dam.

DSOD officials were called and arrived at the dam. The dam was covered with plastic sheeting and measures were taken to relieve pressure on the dam, including the pumping and siphoning of water. On March 4, defendant Doody made a determination that the dam no longer had the capacity to retain water and had to be breached.

Over the next several days, through DSOD efforts, the water level was lowered and residents were allowed to return to their homes. The named defendants also inspected the dam, the spillway, and slide conditions. The DSOD determined that the dam's spillway required modifications to allow for additional water drainage.

On March 11, the defendant engineers met with SLOA officials and their attorney before noon and advised them that the DSOD was going to breach the dam. This decision was made after determining that the dam was unsafe and was intended to avoid the possibility of any future emergency conditions in the area. DSOD Division Chief Doody made the decision to breach the dam. His decision was based on the recommendations of his DSOD subordinate engineers who had been evaluating information obtained from tests performed during a week of extensive operations at the dam. Specifically, Doody relied on the reports of a Regional Engineer for the Southern Region, the Chief of the Engineering Branch, an Associate Field Engineer for Area 7, the Chief of the Field Engineering Branch, and an Area Engineer for Area 7 of the DSOD. All DSOD engineers were in agreement that the dam was unsafe and required breaching.

The SLOA contacted an attorney to sue in state court to obtain a temporary restraining order to prevent state DSOD officials from breaching the dam should they decide to do so. The DSOD delayed breaching the dam until the matter was heard in court. On March 11, Judge Peck of the Ventura County Superior Court denied the SLOA's application for a restraining order. Plaintiffs did not seek a stay of the denial in order to obtain appellate review. The dam was breached after Judge Peck denied the restraining order.

### Qualified Immunity for Governmental Officials

Plaintiffs have based their constitutional claim on a theory that defendant's actions were undertaken with the intent to deprive plaintiffs of their procedural and substan-

tive due process rights under 42 U.S.C. § 1983. The Court concludes, however, that as a matter of law, the qualified immunity doctrine shields the DSOD officials. Thus, the preliminary inquiry into the qualified immunity issue is ultimately dispositive.

The defendants made a motion for judgment on qualified immunity grounds at the conclusion of plaintiff's case. The Court granted motion as to all defendants' except for defendant Doody. A ruling on Doody's motion was deferred until the evidentiary case had been concluded.

General Qualified Immunity Standard

■ When performing discretionary functions, government officials are entitled to qualified immunity unless, in taking the challenged action, they violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). State officials cannot be held liable for damages under section 1983 unless their conduct violates a clearly established constitutional right. *Davis v. Scherer,* 468 U.S. 183, 193, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 *reh'g denied,* 468 U.S. 1226, 105 S.Ct. 26, 82 L.Ed.2d 919 (1984); *Wood v. Ostrander,* 879 F.2d 583 (9th Cir.1989). This immunity is granted since governmental officials must act "promptly and decisively when they perceive an emergency." *Sinaloa Lake Owners Ass'n v. City of Simi Valley,* 882 F.2d 1398, 1406 (9th Cir. 1989).

■ Because qualified immunity operates as an "immunity from suit rather than a mere defense to liability," trial courts must attempt to "resolv[e] immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant,* — U.S. —, —, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991). Thus, immunity is a matter that should be decided by the court long before trial. *Id.* at —, 112 S.Ct. at 537. Indeed, the Ninth Circuit has mandated the need for qualified immunity determinations to be made at summary judgment with "every effort to develop the record to the extent necessary to make the determination at that stage." *Act Up!/Portland v. Bagley,* 971 F.2d 298 (9th Cir.1992). Further, the issue of immunity may be resolved in a defendant's favor as a matter of law, after the facts are first assumed in plaintiff's favor, as in the case of summary judgment. *Prokey v. Watkins,* 942 F.2d 67, 73 (1st Cir.1991).

■ The Court does recognize that qualified immunity determinations are not always legal determinations for the court to make. A case may properly proceed to the jury if there is a genuine issue of material fact underlying the qualified immunity question. *Act Up!/Portland,* 971 F.2d 298.

As an example, the Court recognizes that this case could have proceeded to the jury, as fact finder, if what the DSOD officials knew at the time was genuinely in dispute and if a reasonable official's perception under the facts would differ depending on the correct version. *Prokey v. Watkins,* 942 F.2d 67, 73 (1st Cir.1991); *See Rakovich v. Wade,* 850 F.2d 1180, 1202 (7th Cir.) (en banc), *cert. denied,* 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988). Qualified immunity determinations depend on the particular facts of each case. *Rakovich,* 850 F.2d at 1204.

■ When making qualified immunity determinations, the Court inquires "whether a reasonable officer could have believed that his conduct was proper under established law." *Id.* This is a question of law for the district court. *Id.* The Court must also determine "whether the [officers] acted reasonably under settled law in the circumstances, not whether another reasonable or more reasonable, interpretation of the events can be constructed ... years after the fact." *Hunter,* — U.S. at —, 112 S.Ct. at 537.

■ The Ninth Circuit recently designated the qualified immunity determination as requiring three inquiries: 1) the identification of the specific right allegedly violated; 2) the determination of whether that right was so "clearly established" as to alert a reasonable officer to its constitutional parameters; and 3) the ultimate determination of whether a reasonable officer could

have believed lawful the particular conduct at issue. *Romero v. Kitsap County,* 931 F.2d 624, 627 (9th Cir.1991). Thus, an officer should prevail if the right asserted by the plaintiff was not "clearly established" or the officer could have reasonably believed that his particular conduct was lawful. *Id.*

The Court concludes that the rights asserted by plaintiff were not "clearly established" in March of 1983. However, even if the plaintiff has asserted "clearly established" rights, the Court finds as a matter of law that a reasonable official could have believed that engineer Doody's actions were lawful. This finding is ultimately dispositive in determining engineer Doody's qualified immunity in this case. Following the three-pronged inquiry of *Romero,* the Court analyzes these elements separately.

### The Specific Rights Violated

Plaintiffs allege that the specific rights violated were 1) the general due process rights of notice and an opportunity to be heard before the dam's breach and 2) substantive rights of not having the dam breached in an arbitrary and capricious manner. Further, plaintiffs assert that defendants acted with malice, with respect to the lack of notice and the actual breaching of the dam.

### The Meaning of Clearly Established

As noted previously, whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on objective legal reasonableness assessed in light of legal rules clearly established at the time the action was taken. *Harlow,* 457 U.S. at 819, 102 S.Ct. at 2738–39.

To be "clearly established", the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). The Court agrees with the Supreme Court's reasoning behind this standard:

the application of this standard depends substantially on the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (*no matter how unclear it may be that the particular action is a violation*) violates a clearly established right ... But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow.* Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights. *Harlow* would be transformed from a guarantee of immunity into a rule of pleading. Such an approach, in sum, would destroy "the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties," by making it impossible for officials "reasonably [to] anticipate when their conduct may give rise to liability for damages." It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: *The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right ... in light of pre-existing law the unlawfulness must be apparent.*

*Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987) (emphasis added).

Plaintiffs bear the burden of proof that the right allegedly violated was clearly established at the time of the alleged misconduct, which in this case was early March of 1983. *Romero v. Kitsap County,* 931 F.2d 624 (9th Cir.1991). As stated by the Supreme Court in *Davis v. Scherer,* 468 U.S. 183, 197, 104 S.Ct. 3012, 3021, 82 L.Ed.2d

139 (1983), "[a] plaintiff who seeks damages for violation of constitutional or statutory rights may overcome the defendant official's qualified immunity only by showing that those rights were clearly established at the time of the conduct at issue." Further, only if plaintiff meets this burden should officials have to prove that their conduct was reasonable even though it might have violated constitutional standards. *Romero*, 931 F.2d at 627. *See also Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 646 (10th Cir.1988); and *Upton v. Thompson*, 930 F.2d 1209, 1212 (7th Cir.1991) (plaintiff must meet burden of identifying to the court the existence of clearly established law).

■ Plaintiffs have asserted broad due process claims of the type rejected in *Anderson*. Additionally, plaintiffs have not identified either statutory or case law establishing such clearly established rights in March of 1983. *See Wood v. Ostrander*, 879 F.2d 583 (9th Cir.1989) (discussing the need for a "survey [of] the legal landscape" as it existed at the time of the action).[3] Finally, although not dispositive standing alone, plaintiff can cite to no case prior to March of 1983 which invalidates the breaching of a dam as impermissible under the Fifth and Fourteenth Amendments. Neither party has pointed to established law governing the level of due process required when a state agency undertakes the breaching of a dam. Thus, the Court finds that Plaintiffs have not satisfied their burden of showing that the constitutional right allegedly violated was clearly established at the time of the alleged misconduct.[4]

However, even if plaintiffs have articulated the violation of a clearly established right, the Court finds the qualified immunity defense shields the defendant because a reasonable dam safety engineering official, similarly situated, could have believed breaching the dam was lawful.

## Reasonable Officials

Qualified immunity attaches if a reasonable officer could have believed his actions were constitutional even if they were not. *Wood*, 879 F.2d at 583. This standard even provides protection to officials who reasonably, but mistakenly act. *Sinaloa Lake Owners Ass'n. v. City of Simi Valley*, 882 F.2d 1398, 1409 (9th Cir.1989). In following the guidance offered by the Ninth Circuit, the Court recognizes that "governmental entities must have much latitude in carrying out their police power responsibilities; *mere errors of judgment, or actions that are mistaken or misguided, do not violate due process. Id.* (emphasis added). *See also Hunter v. Bryant*, —— U.S. ——, ——, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) ("qualified immunity standard gives ample room for mistaken judgments").

Evaluating the evidence presented at trial to determine the qualified immunity issue as a matter of law, the Court finds that the DSOD engineers acted reasonably under the circumstances. At the time of the breach in 1983, these engineers, all of whom were dam safety experts, concluded that the public's safety required a breaching of the dam. Given the facts possessed by the named defendants at that time, a reasonable dam safety engineer could have believed that the need to breach the dam

---

**3.** Plaintiff merely states that rights to due process are guaranteed by the 5th and 14th Amendments to the U.S. Constitution and enforceable against state officials under 42 U.S.C. § 1983. Specifically, plaintiff broadly claims that deprivation of a property right without first providing a meaningful hearing is a denial of the right to procedural due process.

**4.** In *Elder v. Holloway*, 975 F.2d 1388 (9th Cir. 1992), the Ninth Circuit reiterated this position, even as this order was being prepared. The appellate panel held that "the plaintiff's burden includes identifying the universe of relevant statutory or decisional law from which the

court can determine whether the right allegedly violated was clearly established." *Id.* at 1393 The court also found that a "district court has no obligation to [come up with relevant law on its own] in the unique context of qualified immunity." *Id.*

The court concluded that if a plaintiff did not show a clearly established right, a district court could properly consider "only the legal facts presented and determine[ ], correctly, that based on those legal facts the plaintiff has not shown that the contours of the right were clear." *Id.* at 1396.

was lawful in light of the totality of the circumstances known.

The DSOD engineers knew that there had been a period of substantial rains. These rains had saturated the dam's soil. There had been two large land slides on the face of the dam, compromising the dam's capacity to retain water. Local and county officials had ordered the evacuation of hundreds of downstream residents from their homes.

Further, these land slides had resulted in a measurable falling away of soil which decreased the thickness, or width of the dam. These combined effects had re-shaped of a portion of the dam's sloped face into a vertical scarp. Evidence also indicated that seepage was occurring from the dam itself.

Evidence at trial showed that chief engineer Doody's decision to breach the dam was based on the collective evaluations, test data, and recommendations of his subordinate engineers. These engineers had overseen and performed studies on the dam specifically to determine the safety of the dam as well as the appropriate response measures. Doody's subordinate DSOD engineers were all in agreement that the dam could no longer retain water safely and had unanimously recommended a breach. There is no evidence that these findings and recommendations were made to Doody in bad faith. Had Doody dismissed the findings of his DSOD colleagues, he would have been remiss both in his duty to safeguard the public's safety, as well as his duties as the senior decision-maker in the California Division of Safety of Dams.

### Statutory Authority

Finally, as an employee of the California Division of Safety of Dams, Doody was functioning in his official capacity. Authority is vested in the DSOD through the California Water Code. Our inquiry focuses on § 6075 through § 6200 of the Code.

The following statutory sections are the laws under which engineer Doody operated:

Under section 6075, "the department, under the police power of the state, shall supervise the ... maintenance, operation, and removal of dams and reservoirs for the protection of life and property as provided in this part." The department has jurisdiction of all dams and reservoirs in the state. § 6076.[5]

Section 6081 enumerates the matters considered in determining whether dams or reservoirs involve danger to life or property and lists the procedures upon finding danger: "In determining whether or not a dam or reservoir or proposed dam or reservoir constitutes or would constitute a danger to life or property, the department shall take into consideration the possibility that the dam or reservoir might be endangered by *seepage, earth movement, or other conditions which exist or which might occur* in any area in the vicinity of the dam or reservoir. Whenever the department deems that any such condition endangers a dam or reservoir, it shall order the owner to take such action as the department determines to be necessary to remove the resultant danger to life and property." (emphasis added).

Section 6100 provides "[s]upervision over the maintenance and operation of dams and reservoirs *insofar as necessary to safeguard life and property from injury by reason of the failure thereof is vested in the department.*"[6]

Section 6110 provides for the DSOD's employment of remedial means to protect life and property. "The department shall *immediately employ any remedial*

---

5. This authority was reaffirmed in the department after the failure of the St. Francis dam, where a California court emphasized the necessity for and the constitutionality of the police power being extended to and including such structures in order to protect the safety of persons and property. *Bent Bros., Inc. v. Campbell,* 101 C.A. 456, 281 P. 717 (1929).

6. The California Water Code, § 6028 states that "[n]o action shall be brought against the state or the department or its agents or employees for the recovery of damages caused by ... the operation of any dam or reservoir upon the ground that such defendant is liable by virtue of any of the following ... (d) Measures taken to protect against failure during an emergency."

*means necessary to protect life and property* if either:

> (a) The condition of any dam or reservoir is so dangerous to the safety of life or property as not to permit of time for the issuance and enforcement of an order relative to maintenance or operation...." [7] (emphasis added).

Section 6111 outlines the steps which the DSOD is authorized to take in an emergency. "In applying the remedial means provided for in this article, the department may in emergency do any of the following:

> (a) Lower the water level by releasing water from the reservoir.
>
> (b) Completely empty the reservoir.
>
> (c) *Take such other steps as may be essential to safeguard life and property."* (emphasis added).

Finally, § 6112 provides that "the department shall continue in full charge and control of such dam or reservoir, or both, and its appurtenances until they are rendered safe or the emergency occasioning the action has ceased."

In light of the circumstances present at the time the dam was breached, the agreement among the DSOD engineers that the dam was unsafe and lacked the capacity to

hold water, and the authority under which engineer Doody operated in protecting the public's safety, the Court concludes that engineer Doody acted reasonably under the circumstances.[8]

In particular, the Court finds that a reasonable dam safety engineering official charged with the protection of public safety could have believed that the actions surrounding the breaching of the dam were reasonable in light of the information related to Doody by his engineers, even if clearly established law had existed governing Doody's conduct. This objectively reasonable determination was a question of law subject to resolution by the Court, not the jury.

The Court also rejects plaintiffs' argument that Doody should have employed less intrusive means than the breaching of the dam. However, even if the Court were to adopt plaintiff's argument that less intrusive means were available [9], the Court finds that Doody's actions at best would amount to a mistaken judgment which does not violate due process. *See Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 882 F.2d 1398, 1409 (9th Cir.1989) ("mere errors of judgment, or actions that are mistaken

---

7. *The Department of Public Works of the State of California v. The City of San Diego*, 122 Cal.App. 159, 10 P.2d 102 (1932), is a rare example of California case law relating to authority over dams. In that case, the court held that the department has the right to "prevent the continued maintenance and operation of a dam in an unsafe condition....". *Id.* at 165, 10 P.2d 102. In continuing, the court said, "[t]he owner of such a dam may be restrained from maintaining it in such a condition that it may be dangerous ... and he may be subject to having his reservoir summarily emptied to a sufficient extent to make it safe, in case of an emergency, or in other words, he may be prevented from operating and maintaining a dam in an unsafe condition." *Id.*

A second remedy discussed within the case, given by statute, is the right, in case the condition of the dam is so dangerous as not to permit of time for the issuance an enforcement of an appropriate order, to take any remedial means necessary to protect life and property, even to the extent of lowering the water in the reservoir or of completely emptying the dam.

The Court notes that in the instant case, plaintiffs did not oppose the emptying of their dam under the March 1983 conditions.

Finally, under California law, "a landowner may be compelled to make his property safe ... he may be required to change the drainage on his property to accommodate the welfare of his neighbors. If the day ever existed when a landowner could permit his property to remain in a dangerous condition in defiance of the public authorities, that day has passed." *People v. Greene*, 264 Cal.App.2d 774, 70 Cal.Rptr. 818 (1968).

8. Indeed, the Court's conclusion is bolstered by the fact that the dam's breach occurred after the temporary restraining order hearing before Judge Peck. At that hearing, the Judge denied the issuance of the TRO. The fact that the TRO was denied would also have entered into Doody's decision to breach the dam.

9. In passing, the Court questions what types of "less intrusive measures" would have been taken. All of the DSOD engineers evaluating the dam were in agreement that the dam was unsafe, no longer had the capacity to hold water, and should be breached. Public safety must be favored, especially in light of the dangers posed by a dam.

or misguided, do not violate due process"); *Prokey v. Watkins*, 942 F.2d 67, 72 (1st Cir.1991) ("if officers of reasonable competence could disagree on this issue immunity should be recognized").

Furthermore, the Court emphasizes that contrary to plaintiffs' arguments, whether or not an actual emergency existed is not the proper subject of dispute. The inquiry, rather, must focus on whether the actions were objectively reasonable. Whether or not an actual emergency existed is not a proper question that should proceed to the jury as fact finder. This case should only have proceeded to the jury if there were genuinely disputed facts as to what information the DSOD officials possessed when making their decision. The existence of an emergency itself (or labelling a set of circumstances "an emergency") is not itself a question of fact, but rather, a conclusion based on facts, information, and circumstances known at that time. No disputed factual issues existed regarding the information which dam engineer Doody based his decision on. This information was relied upon both by the DSOD, as well as by plaintiffs' experts, in preparation for this litigation. Thus, the Court could properly determine whether an objectively reasonable official, with undisputed information and facts, would have believed those actions to be lawful.

### Allegations Of Malice

■ Additionally, the Court finds no evidence to support plaintiffs' claims that dam engineer Doody acted maliciously with a secret intent to deprive plaintiffs of due process rights. It is the settled law of this circuit that irrational or malicious actions are not within the legitimate purview of the state's power. *See e.g. Sinaloa*, 882 F.2d at 1408. Plaintiffs allege that the DSOD defendants acted maliciously and intentionally concealed their decision to breach the dam until the last possible moment, presumably to deprive the plaintiffs from an opportunity to be heard. Plaintiffs argue that no emergency existed, therefore the actions were implemented with wrongful intent.

As the Supreme Court has stated, "[u]nder the *Harlow* standard ... an allegation of malice is not sufficient to defeat immunity if the defendant acted in an objectively reasonable manner." *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). Thus, since the Court has determined that Doody acted in an objectively reasonable manner, the qualified immunity defense applies.

The Court also finds that no reasonable juror could have found, on the basis of this record, that the defendants acted maliciously. Plaintiffs' evidence produced at trial fails to demonstrate a wrongful intent on the part of dam engineer Doody and his subordinates.

As stated previously, evidence shows that Doody relied on his subordinate engineers' recommendations. All the engineers were in agreement concerning both the capacity of the dam to hold water and the recommendation to breach the dam. To find that Doody's decision was made with malice, the Court would have to find that all DSOD engineers involved in the operations and investigations in March of 1983 had the intent to deprive the plaintiffs of their due process rights. The Court finds that insufficient evidence was produced to support charges of wrongful intent.

As to plaintiffs' conclusion that no emergency existed, this claim is based on a review of DSOD records and data compiled during the events in March 1983. As the Supreme Court held in *Hunter v. Bryant*, "the court should ask whether the [officials] acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed ... years after the fact." Viewing the events and information that the DSOD possessed in March of 1983, the Court concludes that a showing of malice is absent.

Finally, as to plaintiffs' assertion that engineer Doody's actions were arbitrary and capricious, the Court finds that the actions were reasonable as a matter of law under the circumstances for the reasons stated above. Officials responsible for protecting the public from harm (which in the

**834**

case of a dam appears to be the substantial type and degree of harm contemplated by the aforementioned policies) should not be second guessed in hindsight by experts who were removed from the actual circumstances that existed at that time.[10]

Qualified immunity grants officials "'great leeway in adopting summary procedures to protect public health and safety,' even in the absence of an emergency [11] in the usual sense." *Sinaloa,* 882 F.2d at 1406. Further, officials should have the power to protect their citizens by breaching a dam considered potentially, though perhaps not imminently, dangerous. *Id.* at 1408. It is objectively reasonable that a dam safety engineer in the position of Doody would have believed that his actions were lawful in light of the information Doody possessed. Doody is therefore qualifiedly immune from suit as well as liability in this matter.

*A fortiori,* the other DSOD defendant subordinate engineers are entitled to the same qualified immunity, particularly since the evidence shows that they did not have the ultimate decision-making authority to breach the dam.

For the reasons stated herein by the Court granting judgment under Federal Rule of Civil Procedure 50(a)(1) and 50(a)(2), judgment is granted in favor of all defendants in this matter against the plaintiffs. Let judgment be entered accordingly.

IT IS SO ORDERED.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve, by United States mail, copies of this Order on counsel for the parties in this matter.

---

**10.** As government officials need to be able to act promptly and decisively when they perceive an emergency, it is inevitable that "[e]xigent circumstances often prompt actions that severely undermine the rights of citizens, actions that might be eschewed after more careful reflection or with the benefit of safeguards that normally constrain governmental action." *Sinaloa,* 882 F.2d at 1410.

**11.** Generally, predeprivation processes are unnecessary when governmental officials perceive an emergency. *Sinaloa,* 882 F.2d at 1406.