931 F.2d 624
 John ROMERO, Dean Harvey, David Seaver, Philip R. Holt,
Steven L. Holt, Plaintiffs-Appellees,
v.
KITSAP COUNTY, Steven Demiero, Michael Charron, Bruce Moore,
Charles Pudwill, Philip Worchester, Donald
Makoviney, Defendants-Appellants.
 No. 90-35448.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 6, 1991.
Decided May 1, 1991.
 
 Robert K. Costello, Asst. Atty. Gen., Olympia, Wash., for defendants-appellants.
 Bill Tobin, Cooper Knudson & Tobin, Vashon, Wash., for plaintiffs-appellees.
 Appeal from the United States District Court for the Western District of Washington.
 Before WALLACE, Chief Judge, and O'SCANNLAIN and LEAVY, Circuit Judges.
 LEAVY, Circuit Judge:
 
 
 1
 This appeal involves consolidated actions filed by four members of certain Washington State Indian tribes and one non-Indian under 42 U.S.C. Sec. 1983 (1988) against Kitsap County, Washington and six Fisheries Patrol Officers (the officers).[1] In their complaints, the plaintiffs alleged, inter alia, that they were arrested in violation of their right to gather shellfish in non-reservation areas, a right they claim was reserved to them in the Stevens Indian Treaties.[2]
 
 
 2
 The officers moved for summary judgment on grounds of qualified immunity. The court denied the motion, and the officers appealed.
 
 
 3
 We have jurisdiction over this interlocutory appeal under 28 U.S.C. Sec. 1291. Duran v. City of Douglas, Arizona, 904 F.2d 1372, 1375 (9th Cir.1990); Baker v. Racansky, 887 F.2d 183, 185 (9th Cir.1989). We reverse. We hold that the officers are immune because the nature and scope of the plaintiff/appellees' right to gather shellfish is not clearly established.
 
 FACTS
 
 4
 On May 27, 1986, April 29, 1988, and May 3, 1988, Steven Holt, an enrolled member of the Suquamish Indian Tribe, was arrested or cited by Washington State Department of Fisheries officers for digging commercial quantities of clams on privately owned uncertified or decertified beaches.[3] In each instance, Holt was charged in Kitsap County District Court with possessing a commercial quantity of shellfish without a health certificate, a violation of Washington law.
 
 
 5
 Philip Holt, Steven Holt's brother, also had been arrested on several occasions since 1986 for gathering shellfish in areas he claims were the usual and accustomed fishing grounds of the Suquamish tribe. On June 9, 1988, Judge James M. Riehl of the District Court of South Kitsap County, Washington, dismissed the charges against Philip, finding that he had a secured and reserved right under the Treaty of Point Elliott to harvest shellfish off the reservation in the usual and accustomed fishing grounds that were not staked or cultivated. Findings of Fact, Conclusions of Law and Order of Dismissal, Nos. 86-4729, 86-9120, 86-6604, 86-1432, 88-1485, 88-1486, 88-5601, and 88-5602, August 19, 1988, Excerpt of Record at tab 28, para. 1. The day after the charges were dismissed Philip was arrested again, along with Steven, while gathering shellfish in Manzanita Bay near Agate Pass.
 
 
 6
 The Holts then filed an action, No. C89-593R, pursuant to section 1983 in the Western District of Washington at Seattle against Kitsap County and the defendant/appellants, the six fisheries patrol officers.
 
 
 7
 On February 24, 1988, a Washington state citizen reported an oyster theft from his oyster farm near Tekiu Point, Washington. Fisheries Patrol Officers arrested John Romero and Dean Harvey, who are enrolled members of the Klallam tribe. They also arrested Dave Seaver, a non-Indian who participated in the oyster-gathering with Romero and Harvey.[4] The three were charged with second degree theft, possessing commercial quantities of shellfish without a health certificate, and transferring oysters without a required permit. A tribal police officer who was present cited Romero under tribal regulations as well.
 
 
 8
 On April 19, 1989, Romero, Harvey, and Seaver filed a complaint in the Western District of Washington, No. C89-592R, pursuant to section 1983 against Kitsap County and officers DeMiero and Charron, alleging, inter alia, that the arrests were in violation of their treaty rights. The Holt and Romero actions were consolidated by the court on November 17, 1989, into C89-592R.
 
 
 9
 The officers moved for summary judgment on grounds of qualified immunity. In the order denying the officers' motion, the district court stated:
 
 
 10
 At this stage of the action, plaintiffs have alleged and the court must accept as true facts supporting the existence of constitutional violations by the Officers which would disqualify them from the protection of ... immunity. Therefore, the Officers' motion on this issue must be denied.
 
 
 11
 Order Denying Plaintiffs' and Defendants' Motions for Summary Judgment, And Staying Certain Claims, No. C89-592R (W.D.Wash. May 9, 1990).
 
 DISCUSSION
 
 12
 We review de novo the denial of a defense based on qualified immunity. White by White v. Pierce County, 797 F.2d 812, 814 (9th Cir.1986). We review the evidence in the light most favorable to the nonmoving party. Id.
 
 Summary Judgment and Qualified Immunity
 
 13
 The defense of qualified immunity protects "government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).[5] Therefore, regardless of whether the constitutional violation occurred, the officer should prevail if the right asserted by the plaintiff was not "clearly established" or the officer could have reasonably believed that his particular conduct was lawful.
 
 
 14
 The plaintiff bears the burden of proof that the right allegedly violated was clearly established at the time of the alleged misconduct. Baker, 887 F.2d at 186 (citing Davis v. Scherer, 468 U.S. 183, 197, 104 S.Ct. 3012, 3020, 82 L.Ed.2d 139 (1984)). If plaintiff carries this burden, then the officers must prove that their conduct was reasonable even though it might have violated constitutional standards. Benigni v. City of Hemut, 879 F.2d 473, 479-80 (9th Cir.1988) ("We have expressly held that good faith is an affirmative defense that a police officer must prove.").
 
 
 15
 The qualified immunity test necessitates three inquiries: (1) the identification of the specific right allegedly violated; (2) the determination of whether that right was so "clearly established" as to alert a reasonable officer to its constitutional parameters; and (3) the ultimate determination of whether a reasonable officer could have believed lawful the particular conduct at issue. Gooden v. Howard County, Md., 917 F.2d 1355, 1361 (4th Cir.1990); accord, Tribble v. Gardner, 860 F.2d 321, 324 (9th Cir.1988) (the first inquiry is whether the law is clearly established given the facts of the case; the second inquiry is whether a reasonable person would have known that he was violating clearly established rights), cert. denied, 490 U.S. 1075, 109 S.Ct. 2087, 104 L.Ed.2d 650 (1989). The first two inquiries under Gooden present pure questions of law. Gooden, 917 F.2d at 1361. The third, although ultimately a legal question, may require some factual determinations as well.[6]
 
 
 16
 The district court did not decide whether the law was clearly established. Instead, it looked to whether there were material issues of fact in dispute, which is the usual procedure in a motion for summary judgment. Ashton v. Cory, 780 F.2d 816, 818 (9th Cir.1986); Fed.R.Civ.P. 56(e). However, when qualified immunity is at stake, a court must first determine whether the law has been clearly established. Tribble, 860 F.2d at 324. If the court decides the law is clearly established, it must then decide whether a reasonable officer would have known that his conduct violated rights. Id. At the third step in the inquiry, it is within the court's discretion to permit limited discovery to determine if there are genuine issues of material fact surrounding the reasonableness of the officer's conduct. Cf. Gooden, 917 F.2d at 1361.
 
 
 17
 Whether the Officers Are Entitled To Qualified Immunity
 
 
 18
 The parties agree that the specific right allegedly violated is whether, under the treaties, members of Indian tribes have a right to take shellfish in non-reservation areas at their usual and accustomed fishing places. However, the parties disagree as to whether that right was clearly established when the arrests and citations occurred here.
 
 
 19
 The treaties themselves do not specifically delineate the Indians' right to take shellfish in such a way that the nature and scope of that right is readily apparent. Article 4 of the Treaty of Point No Point (Hahd-skus), Washington Territory, negotiated with the villages of the S'Klallams (Klallam) Indians and dated January 26, 1855, 12 Stat. 933 (1859), states only:
 
 
 20
 The right of taking fish at usual and accustomed grounds and stations is further secured to said Indians, in common with all citizens of the United States; and of erecting temporary houses for the purpose of curing; together with the privilege of hunting and gathering roots and berries on open and unclaimed lands. Provided, however, That they shall not take shell-fish from any beds staked or cultivated by citizens.
 
 
 21
 Article 5 of the Treaty of Point Elliott (Muckl-te-oh), which was negotiated with the Suquamish and dated January 22, 1855, 12 Stat. 927 (1859) is identical, except that the common right "to take fish" is shared with "citizens of the Territory."
 
 
 22
 Given the extensive litigation that has taken place with respect to these articles to establish the Indian rights with respect to anadromous fish under the Stevens Treaties (of which the Treaties of Point No Point and Point Elliott are a part), see generally Fishing Vessel Ass'n, 443 U.S. at 661-74, 99 S.Ct. at 3062-68, we conclude that without litigation to establish similar rights to shellfish, those rights cannot be clearly established by virtue of the treaty language alone. That fact is emphasized by the recent filing of an action in federal court to determine the Indians' right to take shellfish. See United States v. Washington, Civ. No. 9213-Phase I (Sub-proceeding No. 89-3) (W.D.Wash.) ("U.S. v. Washington II ").
 
 
 23
 To determine whether this right to shellfish is otherwise clearly established, "in the absence of binding precedent, a court should look at all available decisional law including decisions of state courts, other circuits and district courts...." Ward v. County of San Diego, 791 F.2d 1329, 1332 (9th Cir.1986), cert. denied, 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987). After examining these decisions, we agree with the officers that the law on this issue is not clearly established.
 
 
 24
 The most telling evidence is in the post-trial substantive orders of Judge Boldt, author of the landmark decision of United States v. Washington, 384 F.Supp. 312 (W.D.Wash.1974), aff'd, 520 F.2d 676 (9th Cir.1975), cert. denied, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976), which affirmed the Indians' right to a share of the runs of anadromous fish. In one of his subsequent decisions, Judge Boldt stated:
 
 
 25
 In order to be entitled to exercise off-reservation treaty fishing rights to nonanadromous fish and shellfish, any tribe party to this case shall, prior to any attempt to exercise such rights, present prima facie evidence and arguments supporting its claim to treaty entitlements to such nonanadromous fish and shellfish upon which the court may make a preliminary determination as to the tribe's entitlement to such species, pending final determination of tribal treaty-right entitlement to nonanadromous fish and shellfish....
 
 
 26
 United States v. Washington, 459 F.Supp. 1020, 1037 (W.D.Wash.), appeal dismissed, 573 F.2d 1117 (9th Cir.1978).
 
 
 27
 There is no evidence the tribes have ever presented a court with evidence and arguments to make a preliminary determination of their rights to shellfish. Because no determination has been made, the law on the right to take shellfish off the reservations cannot be "clearly established." "If the controlling law is not clearly established, a reasonable person would not be expected to know how to structure his conduct in order to avoid liability. In such a case the defendant will be immune from suit." Todd v. United States, 849 F.2d 365, 368-69 (9th Cir.1988).
 
 
 28
 The plaintiffs/appellees maintain that despite federal law, decisions of Washington state courts demonstrate the law was clearly established that Indians have a treaty right to take shellfish from areas off the reservations. They cite State v. Courville, 36 Wash.App. 615, 676 P.2d 1011 (1983). Courville, however, arose because there was a question, given Judge Boldt's requirement of a "preliminary determination" of shellfish rights, whether an Indian arrested for gathering shellfish could use the treaty as an affirmative defense. The Court of Appeals of Washington, reversing a lower court ruling, held that the treaty language could be used as a defense before any preliminary determination of shellfish rights took place in federal court. Courville, 36 Wash.App. at 621, 676 P.2d at 1015. The Washington appellate court recognized that shellfish rights need not be established to present such a defense:
 
 
 29
 The language in 459 F.Supp. at 1037 appears to require the treaty tribes to adhere to a specific procedure prior to exercising their 'power to regulate their own members and to arrest violators of their regulations apprehended on their reservations or at usual and accustomed fishing sites.' This would not affect or restrict individual tribal members' substantive rights under their tribe's treaty rights. That prior adjudication of a treaty right is not a prerequisite to the assertion of a treaty defense is further evident by the fact that the treaties are self-enforcing and became obligatory on the parties when ratified.
 
 
 30
 Id. (citations omitted). Thus, the Washington appellate court did not adjudicate the nature and scope of any treaty right to shellfish in Courville. Instead, the court merely recognized the defense could be raised despite the lack of prior adjudication of a treaty right.[7] We view this as a clear statement by the court that rights to gather shellfish are not yet clearly established as a matter of law.
 
 The June 10, 1988 Incident
 
 31
 The issue that remains is the arrest of Philip Holt on June 10, 1988. The day before, June 9, 1988, Judge Riehl had dismissed the action, ruling from the bench. In his written opinion dated August 19, 1988, Judge Riehl stated: "[t]he federally secured and reserved right of members of treaty tribes to harvest shellfish free of criminal prosecution, including harvesting hardshell clams off reservation in their usual and accustomed areas, has been recognized and upheld in Washington State courts and in the federal courts."[8] Findings of Fact, Conclusions of Law and Order of Dismissal, No. 86-4729 et. seq., August 19, 1988, Excerpt of Record, at 8, para. 2. The Judge also found that Dyes Inlet, where Holt had been gathering shellfish, was a usual and accustomed fishing place of the Suquamish tribe. Id., para. 3.
 
 
 32
 The appellees argue that one of the defendants knew of this ruling, yet participated in the arrest of Philip Holt the following day. The implication of this argument is that the officer knew the law was clearly established but violated Holt's treaty rights anyway.
 
 
 33
 There is uncertainty in the record as to which officer, if any, was present at Judge Riehl's ruling from the bench.[9] There is also some uncertainty as to exactly what Judge Riehl stated in his oral ruling. However, assuming that he ruled from the bench as he did in his written opinion of August 19, 1988, and that it is correct that at least one of the officers was present at the ruling, we conclude that the officers could reasonably have concluded that the law was not clearly established.
 
 
 34
 First, there is nothing in the record to show that the place of Holt's arrest on June 10, 1988, which was Manzanita Bay near Agate Pass, was found to be a usual and accustomed fishing ground in the action dismissed on June 9, 1988. Judge Riehl's opinion dealt only with Dyes Inlet as a usual and accustomed fishing ground. Findings of Fact, Conclusions of Law and Order of Dismissal, at para. 3. Therefore, the officers would have no way to know whether Manzanita Bay was a place where Indians might gather shellfish legally under Washington State law.
 
 
 35
 Second, any officer who was present at the ruling would have heard the prosecutor say that the state would not accept the decision of the court, and would appeal. From this, an officer could reasonably conclude that the law was still in controversy, rather than clearly established.
 
 
 36
 Because we find the law not clearly established as to the nature and scope of the Indians' right to gather shellfish in areas off the reservation, a reasonable fisheries patrol officer would not have known that he or she may have been violating treaty rights by citing or arresting Indians for gathering shellfish. Because the law is unclear, a reasonable officer could have believed it appropriate to arrest the plaintiff/appellees. Consequently, under Harlow, the officers are entitled to qualified immunity.
 
 
 37
 REVERSED AND REMANDED. The district court shall enter an order dismissing these consolidated actions in conformance with this decision.
 
 
 
 [1]
 The officers are Steven DeMiero, Michael D. Charron, Bruce Moore, Charles Pudwill, Philip Worchester, and Donald Makoviney
 
 
 [2]
 The Stevens treaties, which established the rights of certain Pacific Northwest Indians to take fish, were negotiated by Isaac Stevens, the Governor of Washington Territory and Superintendent of Indian Affairs, between the United States and the Indians in the 1850's. Washington v. Washington State Comm'l Passenger Fishing Vessel Ass'n, 443 U.S. 658, 666-69, 674-79, 99 S.Ct. 3055, 3064-66, 3068-71, 61 L.Ed.2d 823 (1979)
 
 
 [3]
 The Washington Department of Health certifies beaches based on their lack of pollutants and lack of a public health risk. Washington State law provides that
 Any person desiring to remove shellfish in a commercial quantity or for sale for human consumption ... shall first apply to the department for a certificate of approval of the growing area. The department shall cause the shellfish growing area to be inspected and if the area meets the sanitary requirements of the state board of health, the department shall issue a certificate of approval for that area.
 Wash.Rev.Code Ann. Sec. 69.30.050 (West 1991).
 
 
 [4]
 Because we find the officers immune from suit, we need not decide whether Seaver has standing, as a non-Indian, to pursue rights reserved to members of Indian tribes by treaty
 
 
 [5]
 In their complaint, the plaintiffs claim that they were deprived of rights secured under both the Constitution and specified Indian treaties. Claims of deprivation of constitutional rights are, of course, cognizable under section 1983, see Carey v. Piphus, 435 U.S. 247, 253, 98 S.Ct. 1042, 1046, 55 L.Ed.2d 252 (1978), as are, under specified circumstances, claims for deprivations of treaty-based rights, see Hoopa Valley Tribe v. Nevins, 881 F.2d 657, 661-63 (9th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1523, 108 L.Ed.2d 763 (1990). By extension, the qualified immunity defense extends to conduct that does not violate clearly established statutory, constitutional, or treaty-based rights
 
 
 [6]
 The Fourth Circuit observes:
 Often trial can yet be avoided if carefully limited discovery reveals that there are no genuine issues of fact concerning the conduct at issue, permitting the court then to rule as a matter of law on the third and ultimate question. See [Anderson v. Creighton, 483 U.S. 635, 646 n. 6, 107 S.Ct. 3034, 3042 n. 6, 97 L.Ed.2d 523 (1987) ]. In some instances, however, material subsidiary questions of fact regarding an official's conduct, or the information reasonably possessed at the time he acted, will still be genuinely in dispute after full discovery, and summary judgment must be denied.
 Gooden, 917 F.2d at 1361.
 We caution that discovery is problematic, for "[u]nless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985).
 
 
 [7]
 The court went on to observe that so long as an Indian could show he or she was gathering shellfish from a usual and accustomed fishing place, the defense was established and criminal proceedings were properly dismissed. Courville, 36 Wash.App. at 623, 676 P.2d at 1016
 
 
 [8]
 Judge Riehl cites to no federal law to support this proposition. Respectfully, we must disagree. No federal court has yet decided this issue
 
 
 [9]
 At oral argument, the plaintiffs' attorney stated that the officer in question was Officer DeMiero. However, the declaration of Linda Holt, Philip Holt's mother, states that the officer was Officer Worchester, and the attorney general agrees
 Moreover, there is conflicting evidence as to whether any officer was present in the courtroom to hear Judge Riehl's ruling on June 9, 1988. According to Linda Holt, Officer Worchester and other witnesses were excluded from the courtroom after the first day, and on the second day the officers were told that their presence was no longer necessary. She states "The same thing happened on the last day." Declaration of Linda Holt, Excerpt of Record at tab 29, at 2. On the other hand, according to Philip Holt, both officers DeMiero and Worchester were present in court on the day of the ruling. Declaration of Philip Holt, Jr., Excerpt of Record at tab 30, at 2.