Genaro OROZCO, Maria Orozco, Lucy Orozco, Luis Orozco, Jr., and Rosa Orozco, a minor child through her guardian ad litem Maria Orozco,

v.

COUNTY OF YOLO, Yolo County Narcotics Enforcement Task Force (YONET), Gary Lipelt, Michael Hudson, Ken Beckstead and 40 unnamed officers, in their individual capacities.

Kenneth BECKSTEAD, Counter–Claimant

v.

Genaro OROZCO, Maria Orozco, Lucy Orozco, Luis Orozco, Jr., and Does 1 through 20, Inclusive, Counter–Defendants.

Civ. No. S–91–055–GEB/GGH.

United States District Court, E.D. California.

Feb. 24, 1993.

888

Constance de la Vega, Steven F. Shatz, University of San Francisco Law Clinic, San Francisco, CA, for plaintiffs and counter-defendants.

Bruce Kilday, Bolling, Walter & Gawthrop, Sacramento, CA, Robert C. Cross, Deputy Atty. Gen., for defendants.

Christopher A. Lee, San Francisco, CA, for counter-claimant.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

BURRELL, District Judge.

This dispute arises out of the execution of a search warrant and an intervening homicide investigation in Madison, California, on June 15, 1990. Plaintiffs Genaro Orozco, Maria Orozco, Lucy Orozco, Luis Orozco, Jr., and Rosa Orozco (the "Orozcos") allege that they were wrongfully arrested when the defendant peace officers transported them to the sheriff's station for interrogation and detained them overnight. The Orozcos move for partial summary judgment on their wrongful arrest claim.[1] Defendants Hudson, Lipelt, Shadinger, Landeros, Williams, and Beckstead move for summary judgment on the ground of qualified immunity. Defendant Kenneth Beckstead, who was shot and injured by Luis Orozco, Sr., counter-claims against the Orozcos, alleging that they were negligent in failing to warn him of the "hidden danger" represented by their mentally-ill family member, Luis Orozco, Sr. The Orozcos move for summary judgment on Beckstead's counter-claim.

The Orozcos' partial motion for summary judgment on their wrongful arrest claim is granted; defendants' cross-motion is denied. The Orozcos' motion for summary judgment on Beckstead's counter-claim is granted.

## FACTUAL BACKGROUND

Between 6:00 and 6:30 p.m. on June, 15, 1990, officers of the Yolo County Narcotics

---

1. Genaro Orozco is not a movant for summary judgment on this issue. This motion concerns only the wrongful arrest claims of Maria, Lucy, Luis, and Rosa Orozco. Also, defendants Michael Hudson and Larry Justus are not implicated in the alleged wrongful arrest. Finally, this motion concerns only the issue whether the Orozcos were wrongfully arrested. The parties did not raise, and the court does not address, the issue of *which defendants are liable* for the alleged wrongful arrest.

Enforcement Team ("YONET") arrived at the Orozcos' home in Madison, California to execute a search warrant. Guns drawn, six officers exited their vehicles and ran toward the house. They first encountered eighteen-year-old Luis Orozco, Jr., lying on the front lawn. Agent Rowden "covered" Agent Hatano with a shotgun as Hatano cuffed Luis' hands behind his back. Luis, Jr., remained prone on the lawn as he was ordered. Hatano later stated that he did not believe that he had probable cause to arrest Luis Orozco, Jr., at that time.

Four officers proceeded to the front door and announced in English that they were police officers and they had a warrant to search the house. Twelve-year-old Rosa Orozco answered the door. The four officers, none of whom could speak or understand more than a few phrases in Spanish, entered the house shouting "Police! *Policia!* Search warrant!" Seventy-year-old Maria Orozco, who states that she neither speaks nor understands English, addressed the officers in Spanish, asking what crime had been committed. The officers did not answer her.

The officers moved through the house, continuing to announce their presence and looking for other occupants. Officer Beckstead saw a man enter a bedroom at the end of the hall. Beckstead proceeded to that room, opening doors and "clearing" each room as he went. Eighteen-year-old Lucy Orozco appeared at the door of her room as Beckstead approached. She wore night clothes and appeared startled, having been sick and in bed when the officers entered the house. Officer Beckstead told Lucy to get down and shoved her down the hallway. She joined Maria and Rosa Orozco in the living room.

The officers continued down the hallway, reaching the back bedroom. Luis Orozco, Sr., who was mentally ill, barricaded himself behind the back bedroom door. When the officers attempted to push open the door, Luis, Sr. fired several gunshots through the partially closed door, killing Officer McKnight and wounding Agent Beckstead. Agents Beckstead and Ferranto returned fire, killing Luis Orozco, Sr.

After the shooting, curious neighbors and members of the press congregated near the Orozco home as police and medical personnel began to arrive. A few minutes after the shooting, the three female Orozcos attempted to walk out of the house. However, Officer Rowden, who had remained on the lawn, pointed his shotgun at them and told them to either put their hands up or to get down on the ground. They turned back into the house.

After the dual homicide, YONET ceded jurisdiction of the scene to the Yolo County Sheriff's Department to investigate the homicides. Sheriff's deputies took control of the house, letting no one enter to preserve the integrity of the crime scene. Because the Orozcos were witnesses to a dual homicide, it was decided that they should be interviewed in a "secure" environment away from the crime scene. Therefore, officers removed the Orozcos from their home, placed them in police vehicles, and drove them to the Sheriff's Department in Woodland. Lucy Orozco was ill, shoeless, and wearing only bedclothes and a blanket, but officers refused to allow her to retrieve a sweater from the house. Luis, Jr., and Rosa were transported separately by different male officers. Luis, Jr., was still handcuffed when he arrived at the station. Lieutenant Shadinger and Sergeant Refsland jointly made the order to transport the Orozcos to the sheriff's station. Shadinger later stated that at the time he did not believe there was probable cause to arrest any of the Orozcos for the homicides or based upon the search warrant. Refsland later stated that he did not believe that there was probable cause to arrest any of the Orozcos.

At the sheriff's station, the officers interviewed each Orozco separately in a small, internal room with no windows to the outside. Lucy was interviewed alone by a male officer. The interviews were completed sometime before 11:30 p.m. The Orozcos were then placed in an empty office overnight. Because neither the homicide investigation nor the drug search had yet been completed, the Orozcos could not return to their home. However, the Orozcos were never told they were free to go or asked if they preferred to stay with friends, relatives, or at a hotel. Officer Williams, who interviewed

both Luis Jr. and Lucy Orozco, said that at the conclusion of the interviews he did not believe that there was probable cause to arrest either Luis, Jr., or Lucy for any crime. Nothing in the record indicates that there was probable cause to arrest Genaro, Maria, or Rosa. Several officers (Shadinger, Refsland, Landeros, and Williams) said that the Orozcos were not free to leave at the conclusion of the interviews.

The homicide investigation was completed about 8:00 a.m. the next morning, June 16, by members of the California Department of Justice, Bureau of Investigation. The officers of YONET then completed the search of the house pursuant to the warrant, finishing late that morning. No drugs or drug paraphernalia were found on the property or persons of the Orozcos. No criminal charges were filed against the Orozcos and they were released and returned to their home about 11:30 a.m.

## PROCEDURAL BACKGROUND

The plaintiffs alleged thirteen causes of action in their amended complaint, invoking federal jurisdiction under 28 U.S.C. § 1343 for alleged violations of their rights under the Fourth and Fourteenth Amendments to the United States Constitution and supplemental jurisdiction over their state law claims arising from the same events.

Defendant Kenneth Beckstead counter-claimed, alleging the Orozcos failed to warn him that Luis Orozco, Sr., was present, mentally ill, and armed. This counter-claim was dismissed without prejudice for failure to state a claim. Beckstead then amended his counter-claim to allege that Luis Orozco, Sr., constituted a "hidden danger" about which the Orozcos had a duty to warn Beckstead. The Orozcos' motion to dismiss the amended counter-claim was denied "without prejudice as this case develops."[2]

2. The Orozcos' motion to dismiss was denied on September 17, 1991. The court noted that Beckstead's allegations were sufficient to state a claim under California negligence law, in particular under California Civil Code section 1714.9, and that there existed significant factual disputes about the elements of the claim:

## ANALYSIS

A party moving for summary judgment has the initial burden of informing the court of the basis of the motion and identifying for the court those portions of the materials on file that demonstrate the absence of any issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir.1990). A plaintiff seeking summary judgment on an issue, as here, bears the burden of establishing a prima facie case that would entitle the movant to a directed verdict if the issue was uncontested at trial. 8 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 2727 (1991); *cf. Watts v. United States*, 703 F.2d 346, 347 (9th Cir.1983). Once the plaintiff-movant makes the initial showing, the burden shifts to the defendant-opponent to come forward with specific facts beyond the pleadings showing the existence of genuine disputes of material fact, i.e., those which can be resolved only by a trier of fact because they may be reasonably resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); Fed. R.Civ.P. 56(e).

Both plaintiffs and defendants move for summary judgment on the Orozcos' wrongful arrest claim. Plaintiffs' motion will be considered first.

## I. WRONGFUL ARREST

The Orozcos allege they were wrongfully arrested in violation of 42 U.S.C. § 1983. To establish a prima facie case under section 1983, plaintiffs must prove two elements: (1) that the conduct occurred under color of law; and (2) that the conduct deprived them of a right, privilege, or immunity under the United States Constitution or federal law. 42 U.S.C. § 1983. It is undisputed that the

It's those factual issues that are in dispute that, at least for right now ... lead me to believe that the counterclaim could state causes of action under that California statute, and also that right now is not the right time to grant summary judgment as to the four occupants of the home. (September 27, 1991, Reporter's Transcript, at 25–26.)

defendants acted under color of law. To prove the second element, the Orozcos must show that the defendants' conduct deprived them of their Fourth Amendment right to be free from arrest unsupported by warrant or probable cause. Because the defendants concede they had neither a warrant nor probable cause to arrest the Orozcos, the sole issue is whether the detention of the Orozcos rose to the level of a de facto arrest.[3]

In the case *sub judice*, the intrusiveness of the police conduct escalated in stages to the point where it clearly constituted a de facto arrest. The events of June 15 to 16, 1990, will therefore be analyzed in three discrete stages: (1) the detention at the Orozcos' home; (2) the transportation to the sheriff's station in Woodland for interrogation; and (3) the custodial interrogation and the continued detention following the questioning.

### A. Detention at the Orozcos' Home.

■ A warrant to search for contraband properly founded on probable cause carries with it the limited authority to temporarily detain the occupants of the premises, at the premises, while a proper search is conducted. *Michigan v. Summers*, 452 U.S. 692, 705, 101 S.Ct. 2587, 2595, 69 L.Ed.2d 340 (1981). In *Summers*, policemen arriving at defendant's residence with a search warrant, encountered the defendant descending the front steps. They requested his assistance in gaining entry and detained him while they searched the premises. The Supreme Court upheld the detention and the search as reasonable. *Id.* at 693–694, 101 S.Ct. at 2589–90.

In assessing the justification for the limited detention, the *Summers* Court considered both the law enforcement interest and the nature of the articulable facts supporting the temporary detention. The Court found the law enforcement interests in preventing flight and protecting officer safety to be of great importance. *Id.* at 702, 101 S.Ct. at 2594. Moreover, the Court found the existence of a search warrant was, by itself, an objective, articulable justification for detention, as "[a] neutral magistrate rather than an officer in the field has made the critical determination that the police should be given special authorization to thrust themselves into the privacy of a home." *Id.* at 703, 101 S.Ct. at 2594.

Furthermore, the Supreme Court emphasized that the approved detention was minimally intrusive:[4]

> The detention of one of the residents while the premises were searched, although admittedly a significant restraint on his liberty, was surely less intrusive than the search itself. Indeed, we may safely assume that most citizens ... would elect to remain in order to observe the search of their possessions. Furthermore, the type of detention imposed here is *not likely to be exploited by the officer or unduly prolonged* in order to gain more information.... Moreover, because the detention in this case was in respondent's own residence, it could add only minimally to the public stigma associated with the search itself and would involve *neither the inconvenience nor the indignity associated with a compelled visit to the station.*

*Id.* at 701–702, 101 S.Ct. at 2593–94, footnotes omitted, emphasis added.

■ Here, defendants first detained the Orozcos while executing a warrant authorizing the search of their home for contraband. When the search commenced Luis, Jr., and Genaro Orozco were handcuffed in the front yard and Maria, Lucy, and Rosa Orozco were confined in the small front room of the house by several officers. Although the officers did not have probable cause to arrest the Orozcos for involvement in a crime, the officers were justified in detaining the occupants at their home during the search under *Michigan v. Summers*.

### B. Transportation to the Sheriff's Station for Questioning.

Immediately after the shootings, the execution of the search warrant was suspended

---

3. The crux of defendants' argument is that the detention of the plaintiffs did not rise to the level of an arrest, and could be supported on less than probable cause.

4. Significantly, the *Summers* Court noted that this detention "was 'substantially less intrusive' than an arrest." *Id.* at 702, 101 S.Ct. at 2594, citation omitted.

and police attention focused on the investigation of the homicides. The officers placed the Orozcos in police vehicles and transported them to the Yolo County Sheriff's Department station in Woodland. At the station, officers questioned each plaintiff separately.

Defendants concede that they did not have probable cause to arrest any of the Orozcos in connection with either the homicides or the drug search. Instead defendants argue that transporting plaintiffs to the station and questioning them there was merely a continued detention incident to the search warrant. However, defendants' several asserted justifications fail, independently and in combination, to support the continued detention and questioning.

■■■ To determine whether the transportation and questioning were continued detentions under *Summers* or whether the detention escalated into an arrest, the court must examine the totality of the circumstances. "Whether an arrest has occurred depends on all the surrounding circumstances, including the extent to which liberty of movement is curtailed and the type of force or authority employed." *United States v. Robertson*, 833 F.2d 777, 780 (9th Cir.1987); *see Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983); *United States v. Brady*, 842 F.2d 1313, 1314 (D.C.Cir.1988). For example, in determining whether an investigatory stop had become so intrusive that it constituted a de facto arrest, the Eleventh Circuit considered whether police had blocked the individual's path or displayed weapons, the number of officers present and their demeanor, the length of the detention, and the extent to which officers physically restrained the individual. *United States v. Hastamorir*, 881 F.2d 1551, 1556 (11th Cir. 1989).

■■■ We must carefully consider the effect of forcibly moving a person from the place where he was originally detained. The Supreme Court has indicated its view that:

the line [between detention and arrest] is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home … and transport him to the police station, where he is detained, although briefly, for investigative purposes.

*Hayes v. Florida*, 470 U.S. 811, 816, 105 S.Ct. 1643, 1646, 84 L.Ed.2d 705 (1985). The Ninth Circuit likewise has held that, although there is no bright line for determining when an investigatory stop becomes an arrest, "a distinction may be drawn at the point of transporting the defendant to the police station." *United States v. Parr*, 843 F.2d 1228, 1231 (9th Cir.1988).[5]

■■■ However, the compelled movement of a detainee does not elevate the seizure to the level of arrest in *all* cases. "[T]here are undoubtedly reasons of safety and security that would justify moving a suspect from one location to another during an investigatory detention." *Royer*, 460 U.S. at 504, 103 S.Ct. at 1328. "In general, officers may take such steps as are 'reasonably necessary to protect their personal safety and to maintain the status quo' so that the limited purpose of the stop may be achieved." *United States v. Jones*, 759 F.2d 633, 636–37 (8th Cir.1985), quoting *United States v. Hensley*, 469 U.S. 221, 235, 105 S.Ct. 675, 684, 83 L.Ed.2d 604 (1985). Therefore, movement of the suspect for the purposes of protecting the officers, without more, does not elevate the detention to the level of arrest.

The Ninth Circuit has explained that the *coerciveness* of the movement and the place

5. See also *Dunaway v. New York*, 442 U.S. 200, 216, 99 S.Ct. 2248, 2258, 60 L.Ed.2d 824 (1979) (arrest occurs when suspect is seized and transported to the police station for interrogation); *United States v. Hernandez*, 825 F.2d 846, 851 (5th Cir.1987), *cert. den.* 484 U.S. 1068, 108 S.Ct. 1032, 98 L.Ed.2d 996 (removal of suspect from scene of the stop to police headquarters usually marks the point at which the investigative stop becomes a de facto arrest); *United States v. Ceballos*, 812 F.2d 42, 49 (2d Cir.1987) (transporting suspect to police station exceeds bounds of *Terry* stop and becomes an unlawful arrest); *United States v. Gonzalez*, 763 F.2d 1127, 1133 (10th Cir.1985) (forcing suspect to go to the police station crosses the line into de facto arrest); *Gonzales v. City of Peoria*, 722 F.2d 468, 477 (9th Cir.1983) (defendant is arrested when transported to police station and placed in cell or interrogation room even if the purpose is investigatory rather than accusatory).

to which the suspect is moved determine whether a detention escalates to an arrest:

> The distinction between [cases holding that detention rose to level of arrest when suspect moved] on the one hand, and [cases finding no arrest] on the other hand, lies in the fact that when police move a suspect from an area open to the public to an enclosed room under police control, the circumstances are deemed to be more coercive than the brief public interview authorized by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868 [20 L.Ed.2d 889] (1968).

*United States v. Baron*, 860 F.2d 911, 915 (9th Cir.1988). The *Baron* court found that many cases construing the limits of a *Terry* detention focused on the coerciveness of the circumstances. *Id.* at 914–15. The *Baron* court distilled from these cases the principle that police may move a suspect without exceeding the bounds of the *Terry*-stop

> (1) when it is necessary for safety or security reasons;
>
> (2) when it is the least intrusive method available to achieve the limited goals of the stop; and
>
> (3) when moving the suspect does not make the circumstances of the detention so coercive that the detention becomes indistinguishable from an arrest.

*Id.* at 915–16; *see also People v. Harris*, 15 Cal.3d 384, 124 Cal.Rptr. 536, 540 P.2d 632 (1975); *People v. Courtney*, 11 Cal.App.3d 1185, 90 Cal.Rptr. 370 (1970).

■ The plaintiffs, as movants, have shown specific facts which, if undisputed, establish that the conduct of the police escalated to a de facto arrest. Specifically, they have shown: they were not free to leave; they were compelled to travel in police vehicles to the sheriff's station; at the sheriff's station they were questioned separately in an internal, windowless room; and they were detained at the sheriff's station overnight following questioning. Defendants, as the

adverse party, therefore must provide the court "specific facts showing that there is genuine issue for trial." Fed.R.Civ.P. 56(e).

Defendants do not dispute plaintiffs' showing on these facts. They concede that the Orozcos were seized for Fourth Amendment purposes, that they were transported in police vehicles to the sheriff's station, questioned individually in an internal office, and kept overnight. Instead, the defendants argue that the detention did not become an arrest because the unusual circumstances of the homicide investigation and suspended drug search justified the Orozcos' detention.

### 1. Transportation of Material Witnesses

■ Defendants assert that transporting Orozcos from their home to the sheriff's station was justified as the Orozcos were material witnesses to the homicides. Defendants' Separate Statement of Uncontested Facts in Opposition to Plaintiffs' Motion for Summary Judgment, May 26, 1992 (hereinafter "Defendants' Separate Statement"), ¶ 13; Henderson Depo. (March 30, 1992) at 105. Defendants cite no authority for their contention, and the court's research reveals the law is to the contrary.[6] No case has been found approving the seizure and detention of a *witness* absent a warrant. Police have less authority to detain those who have witnessed a crime than to detain those suspected of committing a crime under the Fourth Amendment. *See* 3 LaFave, *Search and Seizure*, § 9.2(b) (1987). Therefore, characterizing the Orozcos as "witnesses" fails to justify transporting them to the sheriff's station for questioning.

Defendants further assert they transported the Orozcos to the sheriff's station to prevent them from "amending their testimony by something they saw after the incident occurred." Defendants' Separate Statement, ¶ 13. Defendants fail to indicate any articulable facts which led them to believe the Orozcos might amend their testimony and

---

6. Independent research reveals that, under certain narrow circumstances, an arrest warrant may be issued upon a showing of probable cause that a witness has material knowledge of a crime and that witness' presence is unlikely to be secured by subpoena. *See Arnsberg v. United States*, 757 F.2d 971, 976 (9th Cir.1985); Fed. R.Crim.P. 46(b); 18 U.S.C. § 3149; Cal.Civ. Proc.Code §§ 1993–94; Cal.Penal Code § 881(b)(d); 2 Witkin, *California Evidence*, § 1042; Note, *Selected 1982 California Legislation: Criminal Procedure*, 14 Pac.L.J. 592–593 (1982).

they again fail to cite authority on this point. The court finds no legal or unique factual support for this justification.

Finally, defendants assert that since the homicides were "a traumatic situation" and "a family member had been involved in the shooting," they were justified removing the Orozcos from the scene. Defendants' Separate Statement, ¶ 13; Refsland Depo. (Sept. 27, 1991) at 60. Witnessing the violent death of a close family member is, no doubt, a very traumatic event. However, defendants fail to explain how this emotional trauma justifies their compelling the surviving family members to travel to the sheriff's station for interrogation and prolonged detention.

### 2. *Plaintiffs' Potential Criminal Culpability*

Defendants next seek to justify the detentions on the ground that they "did not know whether the plaintiffs had any criminal culpability for assisting the shooter ..., and did not know to what extent the plaintiffs had participated in the drug trade." Defendants' Separate Statement, ¶ 13; Shadinger Depo. (Jan. 31, 1992) at 29–30. These suspicions are based on two facts: (1) the Orozcos live there; and (2) "they were present when ... the shooting happened." Shadinger Depo. (Jan. 31, 1992) at 20–21. These suspicions do not establish sufficient reason to move the Orozcos from their residence to the sheriff's station for questioning.

### 3. *Officer Safety*

Finally, defendants assert that the "total chaos and confusion" of the post-shooting scene created a concern for officer safety that justified transporting the Orozcos to the sheriff's station for questioning. Defendants' Separate Statement, ¶¶ 10, 13; Refsland Depo. (Feb. 25, 1992) at 74. This "chaos" was created by a combination of the gunshot victims, surviving family members, numerous law enforcement and rescue officers, gathering onlookers and members of the press, as well as at least one ambulance and helicopter. Refsland Depo. (Feb. 25, 1992) at 74. However, the defendants fail to present specific facts indicating that the gathering onlookers and passersby presented a threat to officer safety. Defendants also state there was a general risk that the Orozcos might "grab[ ] a kitchen knife or do[ ] something else." *Id.* at 103. However, they fail to articulate specific facts to provide a reasonable basis for believing the Orozcos presented such a risk. The uncontroverted evidence reveals that until they were removed from their home Genaro and Luis, Jr., remained handcuffed and prone on the lawn while Maria, Lucy, and Rosa sat quietly at the kitchen table. *Id.* at 111.

### 4. *Conclusion*

Defendants fail to provide a single justification, legal or factual, supporting their assertion that transporting the Orozcos amounted to a mere detention. Clearly, the circumstances of the Orozco's detention became so coercive as to be indistinguishable from a full-scale arrest when the officers transported the Orozcos to the sheriff's station without their consent.

### C. *Interrogation and Continued Detention at the Conclusion of Questioning.*

■ Although the detention had already ripened into a full-scale de facto arrest, the coerciveness of the detention increased significantly when the officers questioned each Orozco separately in a small, windowless, internal interrogation room. This was the paradigmatic "enclosed room under police control." The interrogation ended sometime before 11:30 p.m. After each Orozco was questioned by the defendants, they were placed in an internal office where they were kept for the night. At no time were they free to leave. At 11:30 the next morning, after police completed the homicide investigation and searched the Orozcos' home pursuant to the warrant, the Orozcos were released from detention and returned to their home. The coerciveness of the separate interrogations and the intrusiveness of the overnight detention clearly indicate that the Orozcos were under arrest during this time.

Defendants concede that they did not have probable cause to arrest any of the Orozcos either before or after the questioning. However, defendants assert that they were justified in holding the Orozcos at the sheriff's station overnight by the police interest in "preserv[ing] the integrity of the crime

scene" and "prevent[ing] interference with the investigation." Defendants' Separate Statement, ¶ 13. While these are legitimate police interests, defendants fail to identify a single fact indicating that the Orozcos were likely to interfere with the investigation or spoil the crime scene. Moreover, the de facto arrests of the Orozcos can not be justified in the absence of probable cause. Therefore, the wrongful arrest of the Orozcos continued until they were returned to their home.

### D. Conclusion.

The Orozcos present a prima facie case of wrongful arrest, and the defendants fail to demonstrate that their conduct was reasonable under the totality of the circumstances or to rebut the finding that the coerciveness of the detention rose to the level of a de facto arrest. Therefore, this court finds that the Orozcos were arrested once they were placed in police vehicles for transportation to the sheriff's station for custodial interrogation and prolonged detention. Accordingly, the Orozcos' motion for summary judgment is granted.

## II. QUALIFIED IMMUNITY

■ The individual defendant peace officers assert they are entitled to qualified immunity on the Orozcos' Fourth Amendment claim for wrongful arrest.[7] The district court must decide a defense of qualified immunity from civil rights violations at the earliest opportunity since qualified immunity is an immunity from suit rather than a mere defense to liability. *Hunter v. Bryant*, —— U.S. ——, ——, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991).

■ Officers are entitled to qualified immunity if their conduct did not violate plaintiffs' clearly established statutory or constitutional rights or if the officers could reasonably have believed that their conduct

was lawful. *Romero v. Kitsap County*, 931 F.2d 624 (9th Cir.1991). The qualified immunity inquiry unfolds in three steps: (1) the identification of the right allegedly violated; (2) the determination whether that right was so clearly established as to alert a reasonable officer to its constitutional parameters; and (3) the ultimate determination whether a reasonable officer could have believed the particular conduct lawful. *Id.* at 627. The right at issue here is easily identified: the plaintiffs' Fourth Amendment right to be free from arrest unsupported by a warrant or probable cause. The second and third steps are discussed below.

### A. Plaintiffs' Right Was Clearly Established.

■ The Orozcos' right to be free from unlawful arrest was so clearly established as to alert a reasonable officer to the constitutional parameters regarding his conduct. Defendants' assertion that their conduct amounted to a mere detention, and not an arrest, is not persuasive.[8] The act of transporting persons to a police station and holding them there for questioning and overnight detention is so inherently coercive that it clearly exceeded the bounds of a "mere detention" and ripened into a de facto arrest requiring probable cause.

■ Defendants argue that they simply detained plaintiffs and assert the Supreme Court has refused to set a time limitation on the duration of investigative detentions. *See United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983); *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981). An investigative detention is determined under the totality of the circumstances and must employ the "least intrusive means reasonably available to veri-

---

7. Defendants assert that they also seek summary judgment on the issue of qualified immunity on plaintiffs' 8th claim, based on the California Constitutional equivalent of the Fourth Amendment to the U.S. Constitution. They state, without support, that state law is the same as federal law.

8. A detention is permissible on reasonable suspicion, while an arrest requires probable cause. Therefore the underlying dispute is whether the police officers' conduct was so intrusive on the individuals' rights when balanced against the law enforcement interests that probable cause rather than reasonable suspicion was required to justify the seizure. *See* I.B., *supra*.

fy or dispel the officer's suspicion in a short period of time." *Florida v. Royer,* 460 U.S. at 500, 103 S.Ct. at 1325–26. In essence, defendants' argument is that since the Supreme Court has repeatedly refused to set down a bright line rule regarding the length of a detention, preferring a flexible standard taking into account the demands of a particular situation, the law in this area could never be considered "clearly established."

This argument is unpersuasive. First, although refusing to establish a bright line rule, the Supreme Court has provided clear guidance on the length of time that will be considered reasonable. The Court has held that "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion." *Place,* 462 U.S. at 709, 103 S.Ct. at 2645. The Court has held a *20 minute* delay reasonable, where the delay was attributable to a defendant, not the police. *Sharpe,* 470 U.S. at 687–8, 105 S.Ct. at 1576–77. However, defendants cite no case in which the duration of the approved detention was remotely close to the approximately 17–hour detention here. Moreover, the Supreme Court, as well as the Ninth Circuit, has clearly held that transporting a person to the police station for questioning constitutes an arrest which must be supported by probable cause. *See Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *United States v. Baron,* 860 F.2d 911 (9th Cir.1988); *United States v. Parr,* 843 F.2d 1228, 1231 (9th Cir.1988). Defendants cite no case in which transporting persons to a police station for interrogation was held to be a detention, rather than an arrest. Therefore, we must conclude that the law clearly establishes that the detention in this case was a de facto arrest.

### B. *The Reasonable Officer Test.*

■ Alternatively, defendants are entitled to qualified immunity if they prove that a reasonable officer possessing the same information could have believed that the conduct at issue was reasonable in light of the clearly established law. *Romero,* 931 F.2d at 627. Defendants argue that they were reasonably justified in detaining plaintiffs until they determined whether the homicide and drug possession investigations provided them with probable cause to arrest any plaintiff.

Defendants argue that they acted reasonably in detaining the Orozcos during the night of June 15 because, in light of the unusual circumstances, they "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the [Orozcos]." *Sharpe,* 470 U.S. at 686, 105 S.Ct. at 1575. Defendants' argument would have the court determine whether the officers were reasonable to detain the Orozcos for 17 hours while the homicide and drug investigations were "diligently pursued." However, this argument ignores the uncontroverted fact that the officers transported the Orozcos from their home to the sheriff's station for custodial interrogation. This fact indicates a quantum of coerciveness that transformed the detention into a de facto arrest.

### C. *Conclusion.*

Defendants concede that at the time they decided to transport the Orozcos to the sheriff's station for questioning they did not have probable cause to believe that the Orozcos were guilty of either the homicides or of drug possession. Furthermore, the law clearly establishes that transporting persons to the police station for interrogation and overnight detention constitutes an arrest. A reasonable peace officer in the place of the defendants would have recognized, given the clear state of the law, that the transportation, custodial interrogation, and subsequent overnight detention of the Orozcos constituted a de facto arrest. Therefore, defendants' motion for summary judgment on the ground of qualified immunity is denied.

### III. BECKSTEAD'S COUNTER–CLAIM

Defendant Beckstead's supplemental state-law counter-claim alleges that he was severely injured as a proximate result of the Orozcos' failure to warn him of the "hidden danger" represented by the armed, mentally-ill

Luis Orozco, Sr. The Orozcos move for summary judgment on several grounds. However, a single defense—the "firefighter's rule"—disposes of plaintiff's motion.

■ California tort law allows emergency personnel (including peace officers) to recover for injuries caused by negligence or intentional acts which occur after the tortfeasor knew or reasonably should have known of the presence of emergency personnel. Cal.Civ. Code § 1714.9. However, the firefighter's rule establishes an exception to the general rule: emergency personnel may not recover for injuries which are caused by the very conduct which necessitated their presence at the scene. *See Hubbard v. Boelt,* 28 Cal.3d 480, 169 Cal.Rptr. 706, 620 P.2d 156 (1980). Although section 1714.9 was enacted partly in response to the *Hubbard* decision, it "simply clarified that the 'firefighter's rule' does not preclude recovery in a proper case where injury is caused by an independent act of misconduct after the [peace officer's] presence is known or should have been known. This does not represent a change in the law." *Gibb v. Stetson,* 199 Cal.App.3d 1008, 1015, 245 Cal.Rptr. 283, 287 (1988), quoting *City of Redlands v. Sorensen,* 176 Cal.App.3d 202, 211, 221 Cal.Rptr. 728 (1985). The firefighter's rule was "not intended to bar recovery for independent acts of misconduct which were not the cause of plaintiff's presence at the scene." *Gibb,* 199 Cal.App.3d at 1013, 245 Cal.Rptr. 283, quoting *Hubbard,* 28 Cal.3d at 486, 169 Cal.Rptr. 706, 620 P.2d 156.

The firefighter's rule was applied to a firefighter who sued a chemical company claiming that it had failed to warn him that a chemical spill he was cleaning up was comprised of highly toxic agricultural chemicals. *Rowland v. Shell Oil Co.,* 179 Cal.App.3d 399, 224 Cal.Rptr. 547 (1986). The court granted the defendant chemical company summary judgment, stating that:

> Treating [ ] chemical spills is traditionally within the scope of a fireman's ordinary

duties, and plaintiffs so concede. By their very nature such operations necessarily create the risk of injury, even death, from explosion, fire, contact with hazardous substances and inhalation of toxic vapors. Of course, the precise nature of the danger present on any given occasion may not be readily apparent but so long as it is of the type ordinarily associated with the handling of potentially dangerous chemicals, the fireman's rule will apply.

*Id.* at 404, 224 Cal.Rptr. 547.

■ By analogy to the present case, the firefighter's rule operates to bar Beckstead's counter-claim. Beckstead went to the Orozco house to execute a search warrant, believing that he would find contraband there. The warrant also authorized the search of any persons found there. Any persons found on the premises would be considered suspects,[9] and Beckstead recognized the substantial risk of encountering dangerous, armed drug traffickers during the search. Moreover, Beckstead and his fellow officers had been briefed about the specific risk a Hispanic male murder suspect might be found at one of the four places authorized to be searched by the warrant.

Indeed, when Beckstead participated in the execution of the warrant he took precautions against an armed suspect, including drawing his weapon and checking all hiding spaces along the corridor. Furthermore, when Beckstead observed Luis, Sr., disappear behind the bedroom door, he recognized the substantial possibility that Luis might attempt to escape or arm himself. After placing the women in the room at the front of the small house, Beckstead and other officers approached the door of the back bedroom. Beckstead and the others attempted to force the door open, but Luis pushed it shut. Luis had in fact armed himself, and he fired his pistol several times, killing McKnight and severely wounding Beckstead.

9. Although in a previous section we found that the police lacked probable cause to arrest the Orozcos, the existence of a search warrant for their home supported *reasonable suspicion* that persons found on the premises were involved in a drug crime. Therefore, they would be considered *suspects. See Michigan v. Summers,* 452 U.S. at 703–704, 101 S.Ct. at 2594–95 ("The connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant").

Under these circumstances, the firefighter's rule bars Beckstead's claim. Beckstead was called to the scene because drug activity was suspected. He knew that drug activities present a significant risk that an officer will be shot. The firefighter's rule will apply in circumstances "where a police officer ... should reasonably anticipate that one of the persons whom he was called on to subdue might resist him by the use of the firearms involved." *Lenthall v. Maxwell,* 138 Cal. App.3d 716, 188 Cal.Rptr. 260 (1982).

Beckstead asserts that the risk of being shot by a drug suspect is distinct from the risk of being shot by what he calls a "non-suspect paranoid schizophrenic whose family allowed him to own a gun after stating publicly that people were coming to kill him and he needed a gun to defend himself." However, the risk to an officer bursting into a house during a drug raid is substantially the same: he willingly confronted the risk of being shot by a paranoid sociopath. Beckstead fails to establish that this risk is distinguishable.

Therefore, because the undisputed facts show that Beckstead was injured by a criminal act (being shot by a drug suspect) which was not independent of the reason he was called to the scene (to execute a drug search warrant), the firefighter's rule precludes Beckstead's claim as a matter of law. Therefore, the Orozcos' motion for summary judgment on Beckstead's counter-claim is granted.

## CONCLUSION

Plaintiffs' motion for summary judgment on liability for wrongful arrest is granted. Defendants' motion for summary judgment on qualified immunity is denied. Plaintiffs' motion for summary judgment on Becksted's counter-claim is granted.

IT IS SO ORDERED.